IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


UNITED STATES OF AMERICA,

   vs.

                               Criminal No.
AIDAN HARDING,              2:25-mj-00136-CBB-1
          Defendant.      2:25-cr-00044-NR-1


- - -


Transcript of Preliminary and Detention Hearing on
February 12, 2025 United States District Court, Pittsburgh,
Pennsylvania, before Judge Christopher B. Brown.


APPEARANCES:

  For the Government:    U.S. Attorney's Office
                         Jeffrey Bengel, Esquire
                         Jessica Smolar, Esquire
                         U.S. Courthouse
                         700 Grant Street
                         Pittsburgh, Pennsylvania 15219

  For the Defendant:     Attorneys at Law
                         Christopher Capozzi, Esquire
                         Casey Mullen, Esquire
                         100 Ross Street, Suite 340
                         Pittsburgh, Pennsylvania 15219

  Court Reporter:        Aimee P. Martin, RMR, CRR
                         700 Grant Street
                         Suite 6260
                         Pittsburgh, Pennsylvania 15219


Proceedings recorded by mechanical stenography;
transcript produced by computer-aided transcription.

INDEX

WITNESS:                                          PAGE:

LAUREN SCOTT
Direct Examination By Mr. Bengel................    7
Cross-Examination By Mr. Capozzi................   55
Redirect Examination By Mr. Bengel..............   83

Wednesday, February 12, 2025

P-R-O-C-E-E-D-I-N-G-S

THE COURT: I'm Judge Christopher Brown. Today is Wednesday, February 12, 2025. Are we doing a preliminary hearing this morning as well?

THE DEPUTY CLERK: Yes, Your Honor.

THE COURT: We're here for the preliminary and detention hearing in the matter of the United States of America versus Aidan Harding 2:25-mj-136.

Before we begin, would Counsel for each party identify themselves?

MR. BENGEL: Good morning, Your Honor, Jeffrey Bengel and Jessica Smolar appearing for the United States.

MR. CAPOZZI: Good morning, Chris Capozzi. To my left is Aidan Harding. I will allow Mr. Mullen to introduce himself.

MR. MULLEN: May it please the Court, Casey Mullen on behalf of the Defendant.

THE COURT: Good morning to you both, and good morning to you, Mr. Harding. Given the fact I am given a binder, there is no agreement, and we are proceeding to a hearing?

MR. BENGEL: That is correct, Your Honor.

THE COURT: With that being said, Mr. Harding, I want to let you know a few things.

First, the Rules of Evidence like you would have at a trial don't apply in hearings like this, so things like hearsay come in.

Second, because the matter involves a particular type of charge, there is something called a presumption of detention, meaning the law presumes you must be incarcerated until this matter proceeds to trial.

Third, you're afforded the opportunity to testify, to present witnesses, to cross-examine witnesses, present information by proffer or otherwise, meaning you and your lawyer can do so in an effort to rebut the presumption of detention and demonstrate that there are conditions or a combination of conditions that would reasonably assure the safety of the community and assure your appearance at future proceedings.

When it comes to the preliminary hearing, really what it is is for me to make a determination whether or not probable cause exists, that the elements of the offense are there, and if they are, then I bound them over for further proceedings.

Do you understand everything I've told you, sir?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Thank you.

Attorney Bengel, are you ready to proceed?

MR. BENGEL: Yes, Your Honor.

THE COURT: Before we do, Number 1, I got this binder just now. I did my best to scan through it.

Has Defense been given a copy of the binder in advance of the proceeding?

MR. CAPOZZI: We were, Judge. Mr. Bengel also provided the exhibits last night, so we were able to download them and review them today.

THE COURT: In terms of some of the exhibits I haven't seen yet which would be videos or something to the like?

MR. CAPOZZI: Mr. Bengel was kind enough to meet with me about 9:00 o'clock this morning so we could review them.

THE COURT: Do you need more time, or are you ready?

MR. CAPOZZI: No, we're good.

THE COURT: I see that we have some family present. You can have a seat. Thank you. Just be aware that some of the topics that are talked about in this hearing today -- I don't know what the Government's evidence is going to be specifically -- but, you know, there are tough topics that are discussed in court proceedings, and this is one of those days.

So if anybody is not interested in hearing some of those tough topics then, if you feel like stepping out while those things are discussed, coming back in -- this is a public courtroom -- you're permitted to do that, and there's no shame in doing that.

Proceed.

MR. BENGEL: Yes, sir.

MR. CAPOZZI: Before Mr. Bengel starts, Judge, Mr. Mullen and I did file this morning an opposition of the Government's request for detention.

Did you receive it?

THE COURT: I have not.

MR. CAPOZZI: I will hand it up, and you can look at it later.

THE COURT: My preference would be to look at it now.

Do you have a copy of it, Attorney Bengel?

MR. BENGEL: Yes, Your Honor.

THE COURT: Folks, you're going to have to bear with me while I take a look at this.

(Pause noted.)

THE COURT: Thank you, Mr. Capozzi. I have had an opportunity to read this. I expect you'll be making similar arguments in your presentation at the close of the hearing.

MR. CAPOZZI: I will, Judge.

THE COURT: Are you ready to proceed?

MR. BENGEL: Yes, Your Honor.

THE COURT: Proceed.

MR. BENGEL: The United States calls Special Agent Lauren Scott.

THE DEPUTY CLERK: Please raise your right hand.

(Administered oath.)

THE COURT: Agent Scott, all I ask is you speak into the microphone. If you speak too close, it pops sometimes.

THE WITNESS: Yes, Your Honor.

THE COURT: Close but not too close.

LAUREN SCOTT, a witness herein, having been previously sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. BENGEL:

Q. Good morning, agent. Would you introduce yourself to the Court?

A. Good morning. Special Agent Lauren Scott with the Federal Bureau of Investigation.

Q. How long have you been a special agent?

A. I began with the bureau in 2020.

Q. And do you have a focus with the bureau?

A. Yes.

Q. What is it?

A. I work violent crimes against children and human trafficking.

Q. Have you been investigating the Defendant, Aidan Harding, for crimes involving child sexual abuse materials?

A. Yes, I have.

Q. Have you charged him by criminal complaint as part of that investigation?

A.  I have.

Q.  So we're going to turn to that investigation, but before we do, are you aware of any other FBI squads with investigations into conduct by the Defendant?

A.  Yes, I am.  My colleagues within the Joint Terrorism Task Force or JTTF have been investigating Aidan Harding.

Q.  As part of that investigation, did agents with the Joint Terrorism Task Force obtain a search warrant for the Defendant's residence?

A.  Yes.

Q.  Have you reviewed the affidavit in support of that warrant?

A.  I have.

MR. BENGEL:  Can we please see what has been marked as Exhibit A?

BY MR. BENGEL:

Q.  Agent, do you recognize this?

A.  I do.

Q.  What is it?

A.  This is the affidavit for the person and residence of Aidan Harding.

Q.  And that's the one obtained by your colleagues on the JTTF?

A.  Yes.

MR. BENGEL:  Your Honor, move to admit Exhibit A.

THE COURT: Any objection?

MR. CAPOZZI: Judge, I object. I recognize the Rules of Evidence aren't formally applied here, but it is completely unrelated to the charge pending against Mr. Harding which is a CSAM charge. And I think the evidence that is about to be developed is also completely unrelated to CSAM. I would submit to the Court that it should not be considered as it relates to a preliminary examination on CSAM issues.

And further, with respect to an allegation of dangerousness, I guess they can go down that road, but we're not there yet. We're at a preliminary examination at this point.

THE COURT: I think we're at a preliminary exam and a detention hearing. Your objection's overruled. I'll permit it as it relates to dangerousness for a detention hearing decision.

MR. BENGEL: Thank you, Your Honor.

BY MR. BENGEL:

Q. Agent, are you aware that, before the Defendant was investigated by the JTTF, he was also investigated by the Peters Township Police Department?

A. Yes.

Q. Are some of the findings of that investigation described in the JTTF affidavit?

A. They are.

MR. BENGEL: Can we please go to Page 27?

BY MR. BENGEL:

Q. Agent, do you see some of the Peters Township findings described in Paragraphs 45 through 48 of the affidavit?

A. Yes.

Q. I would like to highlight Paragraph 46 and ask you to read that.

A. "In May 2017, PTPD was contacted by Peters Township School District in reference to a notebook belonging to HARDING, which contained writings that referenced homicidal thoughts, Columbine, swastikas, and drawings of weapon designs, to include a person shooting other people with a gun."

Q. Do you know if the Peters Township Police Department investigation resulted in any charges against the Defendant?

A. Yes.

Q. Can you describe those charges, please?

A. In 2019, they were terroristic threats, that he was an adjudicated delinquent.

Q. Are some of the communications involved in that case summarized in the JTTF affidavit?

A. Yes.

MR. BENGEL: Can we please go to Page 25?

BY MR. BENGEL:

Q. In the table beneath Paragraph 44, are there communications by an Instagram user, "Rebel"?

A.  Yes.

Q.  I want to ask you to start reading these communications.

A.  Rebel states, "I used to have a plan.

And it was good.

I am very smart I have an iq of 130 which is so high so I'm very good at deception and making plans and doing things.

I don't know how they made there bombs I mad mine more stupid because I don't know anything about detonators but I made a different type that is full proof.

And is also a 20 pound propane time bomb.

I also know how to make Molotov's pipe bombs smoke grenades and pull pin pipe" --

Q.  We might have to zoom back out and go to the next page now.

A.  -- "bombs and small handheld versions of the propane bomb so basically mini time bombs.

I also had the guns and gear down.

I was deciding if I should go tactical and or dress like them so I'm going with a mix of ibetween.

And I would use an ar15 probably a Daniel defense and a glock 19 handgun and a mossberg 14 inch barrel shockwave.

Shot gun.

I had an awesome plan I would have either gone in guns blazing which would be hella easy and high kill count or go in with bombs which probably won't work and it will probably get

me killed.

So I was just gonna go in guns blazing.

But I was gonna do it when I'm like 19 or 21.

The only thing that was holding me back is a partner.

I wouldn't do it alone.

Or die alone."

Other user states, "I'd do it with ya my gf would help us too lol."

Rebel states, "Haha hell yeah.

But I'm gonna be a good boy for the police so that way I can keep my record straight and then get guns and leave my mark on the world."

Other user states, "YESS."

Rebel states, "Teach people that they need to stop bullying."

Q. Next page, please.

A. Rebel states "People always say oh violence doesn't solve anything but when I put a bullet in all the bad peoples heads then there will be no bad in the world.

Eric and Dylan were kickstarting a revolution.

And I am basically a prophet or an apprentice to finish what the gods started."

Q. So, agent, you just read the message about Eric and Dylan starting a revolution, correct?

A. Yes.

Q. Do you know the first names of the people who murdered 13 people at Columbine High School in 1999?

A. Yes, I do.

Q. Were they Eric and Dylan?

A. They were.

Q. Fair to say that in the messages you just read, the Defendant was talking about perpetrating his own high-kill count attack; is that right?

A. Correct.

MR. CAPOZZI: Objection. Leading and conclusory, and that's a determination for the Court to make. Move to strike.

THE COURT: Restate.

BY MR. BENGEL:

Q. Rebel talks about perpetrating his own high-kill count attack, correct?

A. Yes.

Q. Did he name any specific weapons he would use?

A. He said an AR-15, probably a Daniel Defense rifle, and other weapons.

Q. So let's move now to 2024. In October of 2024, did Meta make an emergency disclosure to FBI concerning Facebook and Instagram accounts connected to the Defendant, Aidan Harding?

A. Yes.

Q. Are some of the communications provided by the emergency disclosure in the JTTF warrant?

A.   They are.

MR. BENGEL:   Can we go to Page 19, please?

BY MR. BENGEL:

Q.   Beneath Paragraph 33, do you see communications made on Facebook by the account Aidan Harding?

A.   Yes, I do.

MR. BENGEL:   Can we go down to Page 20?

BY MR. BENGEL:

Q.   A little more than halfway down the page, do you see a message from A. Harding that starts "what kinda trigger is that"?

A.   Yes.

Q.   Can you please start reading there?

A.   A. Harding states, "What kinda trigger is that, I have a binary for my dmm4v7."

Continues, "And what model Daniel defense is it?"

Individual 2, "Dd4 mk-12.  Trigger is called a rare breed trigger."

A. Harding states, "Oh shit, if it's forced reset how is it legal" -- laughing crying emoji -- "not that I give a shit idk what my dad told u but I'm hardcore libertarian and I'll put it as 'don't like'" -- in quotes -- "the Government."

Q.   Let me pause you there.  There's a message where A. Harding mentions a DMM4 V7.  Do you know what that is?

A.   It's a type of Daniel Defense.

MR. BENGEL: Let's scroll down please, down to the next page. Can we please highlight the last message from A. Harding?

BY MR. BENGEL:

Q. Agent, can you please start reading toward the end of that message of "I can't afford?"

A. "I can't afford a 2000$ rifle rn and I have a ddm4 but I'm definitely interested in the trigger/lower."

Q. Okay. What is a forced reset trigger?

A. Forced reset trigger, it lowers the weight of the trigger so that it allows for a more rapid subsequent shot.

Q. Now, we previously read a message from Rebel that mentioned a Daniel Defense rifle in connection with a high-kill count attack; is that right?

A. Correct.

Q. Who has Rebel been identified as?

A. Rebel is Aidan Harding.

Q. And the materials received from Meta, were there communications about such high-kill count attacks?

A. Yes.

MR. BENGEL: Can we please see Page 17?

BY MR. BENGEL:

Q. Under Paragraph 28, do you see communications from the Instagram account Reaper?

A. I do.

Q. And who was identified as Reaper as part of the investigation?

A. Aidan Harding.

Q. Can you please read the messages from Reaper in this table?

A. Reaper states "So the shooters and bombers and shit were cool to me.

Especially the political and revenge driven ones.

I wasn't into a lot of true crime though, I thought a few of the serial killers were interesting but my favorites cases was columbine, the Oklahoma City bombing, pekka the Finnish school shooter, Brendon tarrant, Robert bowers and I thought Jeffery dahmers case was very disturbing and interesting too.

Yea he's disgusting, I just think the case is interesting, and how he disposed of the bodies and shit, and yea the worlds better off without the race mixers and" -- F with laughing crying face.

Q. So, agent, you're familiar with the mass shooting at Columbine High School? We already discussed that, correct?

A. Yes.

Q. And you're familiar with the Oklahoma City bombing?

A. Yes.

Q. Are you also familiar with a shooting at a Finnish school in which an 18-year-old murdered eight people?

A. Yes.

Q. Are you also familiar with Brandon Tarrant, a white nationalist who murdered 51 people at a New Zealand mosque?

A. Yes.

Q. Are you familiar with Robert Bowers, an individual from the Western District of Pennsylvania who murdered 11 people in 2018 at the Tree of Life Synagogue in an anti-Semitic attack?

A. Yes.

Q. And these are Reaper's favorite cases, right?

A. Yes.

MR. CAPOZZI: Objection. Move to strike.

THE COURT: It's stricken. I can read the text.

MR. BENGEL: Page 13, please.

BY MR. BENGEL:

Q. Agent, did agents see anti-Semitic messages in the emergency disclosure from Meta?

A. Yes.

Q. In Paragraph 18, there's a reference to an Instagram group. What is it called?

A. Hitlers Supreme Henchmen.

Q. And can you please read the messages below sent by Reaper?

A. Reaper states, "And no I'd never shoot y'all. None of y'all are Jews."

MR. BENGEL: Can we move to Page 14, please?

BY MR. BENGEL:

Q. Do you see additional messages here from Reaper?

A. I do.

Q. Can you please read them?

A. Reaper states, "Thank you! I was definitely lost as a kid but I was always on the right track, since birth I was hardcore nationalist, traditionalist and militarist, took me a while to open my eyes to the international Jewish problem but I fully understand it now, I fight all I can to save my country from them, I also risk my safety and identity being leaked in order to do activism regularly and joined 3 different activist organizations in my area, so I do what I can to help America recover from this degeneracy.

Hell yea! That's so cool! my birthday is the day after yours, on august 31 I will turn 20.

Yes that's all we can do, that's why I do activism, to stand up for my people and to show the world who's behind all of our problems, I also spread flyers naming the Jew and what they've done I even go into Jew neighborhoods and fly swastika flags and put out antiSemitic flyers."

Q. Agent, here, Reaper says he'll turn 20 on August 31st; is that right?

A. That's correct.

Q. What is Aidan Harding's birthday?

A. August 31, 2004.

Q. Harding also talks about targeting, quote, "the Jew" with swastika flags and anti-Semitic flyers?

A. Correct.

MR. CAPOZZI: Objection.

MR. BENGEL: Reaper talks about that, Your Honor.

MR. CAPOZZI: Objection.

THE COURT: What's the basis of the objection?

MR. CAPOZZI: Judge, he's summarizing and leading as it relates to the text message. The Court can read it.

THE COURT: I can read it. I don't need it summarized, but the objection's overruled. If you want to just ask the question.

MR. BENGEL: I'm just trying to organize.

THE COURT: Give context, sure.

BY MR. BENGEL:

Q. Have you seen evidence that the Defendant engages in that type of conduct?

A. Yes.

Q. Does the JTTF affidavit discuss the discovery of some Nazi and anti-Semitic flyers by the Pittsburgh Bureau of Police?

A. Yes, they do.

MR. BENGEL: Can we please move to Page 15?

BY MR. BENGEL:

Q. I'm going to ask you to read Paragraph 24 which breaks over two pages.

A. "On September 26, 2024, Pittsburgh Police recovered a banner hanging from a bridge at the intersection of Route 65

and the West End Bridge that read, 'HITLER WAS RIGHT. DEPORT INVADERS. National Socialist Brotherhood,' as referenced in incident report" -- number beginning with PGH. "On September 28, 2024, Pittsburgh Police received a call regarding a sheet hanging from the 10th Street Bridge over Interstate 376 that read, 'FUCK ANTIFA. SWASH ZOG!', as referenced in incident report" -- beginning with PGH. "Image comparison confirmed the reported banners had been identical to the banners REAPER (HARDING) shared on Instagram with an INDIVIDUAL_1 and corresponded with the incident report dates."

Q. Is there evidence about these particular banners and the Reaper Instagram account?

A. Yes.

MR. BENGEL: Can we go back to Page 15, please?

BY MR. BENGEL:

Q. So you see that evidence summarized in Paragraphs 22 and 23?

A. I do.

Q. And an additional banner that says "14. 88. WE ARE EVERYWHERE" with swastikas?

A. Yes.

Q. Was Aidan Harding ever arrested in 2024?

A. Yes.

Q. Is that arrest described in the JTTF affidavit?

A. It is.

MR. BENGEL: Can we take a look at Page 16?

BY MR. BENGEL:

Q. I'm going to ask you to please read Paragraph 25.

A. "On or about September 27, 2024, HARDING was arrested and charged with criminal mischief by South Park Township Police after spray painting a tunnel with Patriot Front rhetoric that read, 'BETTER DEAD THAN RED PATRIOTFRON,' as referenced in incident report" -- beginning with a 2. "The arresting officer located a small can of pepper spray and a knife on the person of HARDING, which HARDING stated was in his possession as they sometimes encounter ANTIFA when out and about."

Q. Agent, do you see reference to the Patriot Front?

A. I do.

Q. Is that an organization known to your colleagues on JTTF?

A. Yes, it is.

Q. What do you know about it?

A. That they are a racially motivated violent extremist group, otherwise known as RMVE, that actually act out in that form.

Q. Let me direct you to December 6, 2024. Are you aware of the Defendant having contact with law enforcement that day?

A. Yes.

Q. What was he doing?

A. He was flying Nazi flags.

Q. Was he alone?

A. No.

Q. Who was he with?

A. An associate, Noah Cron.

Q. Where did this happen?

A. On the Liberty Bridge.

Q. That's downtown Pittsburgh?

A. Yes.

Q. So did JTTF ultimately execute a search warrant at Aidan Harding's residence?

A. Yes.

Q. What date did that happen?

A. December 11, 2024.

Q. Was the warrant executed with the aid of a SWAT team?

A. Yes.

Q. Why?

A. Due to some statements he had made, it was for the safety of officers and agents involved.

Q. When agents entered the house, was Aidan Harding there?

A. Yes.

Q. Who else was there?

A. Noah Cron.

Q. I want to talk to you about the types of items recovered. Did agents seize firearms as part of the search?

A. Yes, they did.

Q. About how many?

A. Approximately 22, 3 of them being antiques.

Q. Were these mostly handguns? Long guns?

A. Mostly rifles.

Q. Fair to say that some of the firearms had messages written on them?

A. Yes.

Q. I want to ask you about some of those messages. Was there at least one firearm with the message "88" written on it?

A. Yes.

Q. What do you understand 88 to refer to?

A. It is my understanding that 88 refers to Heil Hitler. H is the eighth letter of the alphabet.

Q. Did you reach that understanding based on conversations with agents from the JTTF?

A. Yes, I did.

Q. Was one marked with the initials NBK?

A. Yes.

Q. Do you know what that is?

A. That stands for "natural born killers".

Q. What's the significance of that note?

A. I don't recall the exact significance, but it's within the JTTF warrant and that background.

Q. Was one marked with the name "Ramirez"?

A. Yes.

Q. What does that bring to mind for you?

A. Richard Ramirez is an LA-based serial killer and rapist.

Q. Was there ammunition in the house?

A. Yes.

Q. Were there knives?

A. Yes.

Q. Like --

A. A lot of them. There was even machete-style.

Q. Were there drugs in the house?

A. Yes, marijuana and paraphernalia within it.

Q. And were there electronic devices?

A. Yes, more than a dozen.

Q. Were there any electronic devices on Aidan Harding's nightstand?

A. Yes. There was an iPhone and an iPad.

Q. Did the agents take photos during the execution of the warrant?

A. They did.

Q. I would like to show you what's been marked as Government's Exhibit B. Do you recognize this, agent?

A. I do.

Q. What is it?

A. This is a photograph from the search, and it's Harding's living room.

        MR. BENGEL: Your Honor, move to admit Government's Exhibit B.

THE COURT: Any objection?

MR. CAPOZZI: Judge, it'll be a continuing objection to what I stated before.

THE COURT: So noted. It's overruled.

MR. BENGEL: If there's no objection, I would like to show four photos in a row and then ask the agent some questions about them.

THE COURT: That's fine.

MR. BENGEL: Can we please see Exhibit C? That's Exhibit D. Can we please see Exhibit E? And now let's show Exhibit F and hold there for a moment, please.

BY MR. BENGEL:

Q. Agent, do you recognize the photos that are marked as Government's Exhibit C, D, E, and F?

A. I do.

Q. What are they?

A. Those are images from the search of Harding's residence, and they are the computer room.

MR. BENGEL: Your Honor, move to admit Government's Exhibit C, D, E, and F.

THE COURT: Defense's objection is noted. They're admitted.

BY MR. BENGEL:

Q. Agent, did you see firearms in these pictures?

A. Yes.

Q. What do you see on the walls?

A. Nazi flag, Hitler.

Q. Are you aware that that book is a copy of Mein Kampf?

A. Yes, Hitler's biography.

MR. BENGEL: Can we please see Exhibit G?

BY MR. BENGEL:

Q. Do you recognize this?

A. I do.

Q. What is it?

A. This is another image from the search, and it's just things that were found within the residence.

Q. I won't ask you to read these. But I'll give the Court a moment to review.

THE COURT: I've seen them.

MR. BENGEL: Now Exhibit H.

BY MR. BENGEL:

Q. Do you recognize this?

A. Yes.

Q. What is it?

A. An image from the search.

Q. These were items contained within Harding's residence?

A. Yes.

MR. BENGEL: Your Honor, move to admit Government's Exhibit G and H.

THE COURT: Defendant's continuing objection, they're

admitted.

MR. BENGEL: Can we see Government's Exhibit I? Now Government's Exhibit J.

BY MR. BENGEL:

Q. Agent, do you recognize Government's Exhibit I and J?

A. I do.

Q. What are they?

A. They are images from the search, and that is Harding's bedroom.

MR. BENGEL: Your Honor, move to admit Exhibit I and Exhibit J.

THE COURT: Again, with Defense's continuing objection, they are admitted.

BY MR. BENGEL:

Q. In Government's Exhibit J, do you see a firearm leaning against that black cabinet?

A. I do.

Q. Have you seen another photo of that firearm?

A. Yes.

MR. BENGEL: Can we please see what's been marked as Government's Exhibit K?

BY MR. BENGEL:

Q. Do you recognize this?

A. I do.

Q. What is it?

A. That's a defense rifle.

Q. And when was this photo taken?

A. At the search on December 11, 2024.

Q. And you see the note that says "1," right?

A. Yes.

Q. Is this a photo that was recovered from the Defendant's bedroom?

A. Yes.

Q. The firearm that was recovered from the Defendant's bedroom?

A. Yes.

MR. BENGEL: Your Honor, move to admit Government's Exhibit K.

THE COURT: Again, admitted over Defendant's continuing objection.

BY MR. BENGEL:

Q. And you testified that's a Daniel Defense rifle, correct?

A. Correct.

Q. And that's the kind of rifle that has come up previously in this hearing?

A. Correct.

Q. Did FBI seize all of the firearms including that Daniel Defense rifle when they executed the warrant on December 11th?

A. Yes, they did.

Q. Following the execution of the warrant, what did agents do

with the seized electronic devices?

A. Agents put them into evidence at the FBI.

Q. And then, what was done with them after that?

A. Then our forensic team will begin the process of downloading the devices to be able to go through them in a better fashion.

Q. Does that happen instantly, or does it sometimes take time?

A. No. It sometimes takes time, days, weeks, months depending on the workload and the amount of data within each device.

Q. While the devices were being processed, did the agents continue to investigate Aidan Harding?

A. Yes.

Q. As part of that investigation, did they learn that he had purchased another firearm?

A. Yes.

Q. When did that purchase occur?

A. January 10, 2025.

Q. And what type of firearm was it?

A. A Daniel Defense rifle.

Q. So that's about a month after FBI seized his Daniel Defense rifle?

A. That's correct.

Q. Are you aware that the Allegheny County Police Department

charged Harding in connection with that purchase?

A. Yes.

Q. Can you please describe those charges?

A. Yes. He was charged with lying on the ATF Form 4473 in purchasing that firearm stating that he was not a drug user.

Q. What date did ACPD attempt to execute their arrest warrant for Harding?

A. January 17, 2025.

Q. And where was the Defendant when he was arrested?

A. At the National Armory in Moon. That's an FFL.

Q. Was anyone with him?

A. Yes. Noah Cron was driving him.

Q. When the Defendant was arrested, what was located in the car?

A. A Daniel Defense rifle and two magazines that were filled with ammunition.

Q. Was Defendant charged by ACPD again as a result of that conduct?

A. Yes.

Q. What was the charge, and what's its status now?

A. The concealed firearm, that would be withdrawn.

Q. Now, by January 17, 2025, was FBI reviewing extractions of some of the Defendant's electronic devices?

A. Yes.

Q. And is this around the time that you became personally

involved in the investigation?

A. That's correct.

Q. How did that happen?

A. In reviewing the iPad that was taken from Harding's bedroom on the nightstand, one of the individuals reviewing it thought -- they found what they thought was CSAM, which is child sexual abuse material, and I previewed said video and agreed with the decision in which I drafted a warrant, an affidavit to search the rest of that device itself but the rest of the devices as well for any type of CSAM and related imagery.

Q. And after you got that warrant, did you continue your review?

A. Yes.

Q. Did you identify at least two videos that you believe are child sexual abuse material?

A. Yes, I did.

Q. And based on those videos, did you seek a criminal complaint charging the Defendant with possession of child sexual abuse material?

A. I did.

Q. Let me show you --

MR. BENGEL: Your Honor, Exhibits L through O are going to be the discussion of the CSAM and some of the related 764 material. We can get into that now.

THE COURT: What the prosecutor is saying, family, is that some of the topics that I talked to you about at the beginning of the hearing that may be sensitive, if you want to step out, you're welcome to do so. If you want to stay, you're welcome to stay, but, again, these are topics that not everyone wants to hear.

Go ahead.

BY MR. BENGEL:

Q. Let me show you what has been marked as Government's Exhibit L.

MR. BENGEL: We can jump down to Page 2, please.

BY MR. BENGEL:

Q. Agent, do you recognize this?

A. This is my affidavit for the criminal complaint that I wrote against Aidan Harding.

Q. Does it remain true and correct to the best of your knowledge?

A. It does.

MR. BENGEL: Your Honor, move to admit Government's Exhibit L.

THE COURT: Any objection?

MR. CAPOZZI: No objection, Judge.

THE COURT: It's admitted.

BY MR. BENGEL:

Q. Agent, in the affidavit, did you describe the items that

you believe qualify as child sexual abuse material?

A. Yes.

Q. Let's go to PDF Page 10 please, Paragraph 23. Are those your descriptions of the two videos in Paragraphs 23a and 23b?

A. Yes.

Q. Can you please read them?

A. "One such video is two seconds in length" -- with that source file name -- "and shows the face of what your Affiant believes to be a prepubescent female before the camera moves to show her anus and vagina.

An additional video approximately 3 seconds in length" -- with that source file name. "This video depicts what your Affiant believes to be a prepubescent female laying on a bed, unclothed, with her legs spread, while what your Affiant believes to be a prepubescent male provides oral sex to the female. The video clearly shows the male licking the female's labia, with entire vaginal area shown to the camera."

Q. Agent, these were located on the iPad; is that right?

A. That is correct.

Q. Was the video described in Paragraph 23a located anywhere else?

A. Yes. We found that image also located on the iPhone. That was the same iPhone that was recovered from Harding's bedroom on the nightstand.

Q. As an investigator of crimes against children, what is the

significance of the videos being found on two separate devices?

A. Generally, individuals with this type of fascination or attraction so to speak, they spread imagery across all devices. That is generally for easy accessibility.

Q. Apart from the videos described in Paragraph 23a and 23b, did you find searches on the iPad that were consistent with a sexual interest in prepubescent children?

A. Yes.

MR. BENGEL: Can we go to PDF Page 9, Paragraph 21?

BY MR. BENGEL:

Q. Agent, what is this list in Paragraph 21?

A. These are some of the searches that Harding had performed on that iPad.

THE COURT: Just so we're clear for the record, this is Page 8 of the criminal complaint?

MR. BENGEL: Yes, Your Honor. I have been giving PDF page numbers to assist with finding it, but, yes, the affidavit is Page 8.

THE COURT: If you could just to make the record complete, when you note that, can you put the page number of the complaint?

MR. BENGEL: Yes, Your Honor.

THE COURT: Thank you.

BY MR. BENGEL:

Q. So, agent, I'm not going to ask you to read all of these, but I do want to ask you some follow-up questions about some of them. Do you see a search for shootings inspired by Columbine?

A. Yes.

Q. And then there are several searches related to Daisy's Destruction. Do you see those?

A. I do.

Q. As an investigator of crimes against children, what does the term "Daisy's Destruction" mean to you?

A. Daisy's Destruction is a video in which a toddler is physically and sexually abused all throughout the video, and it is several minutes in length, around a half an hour in which it continues all the way through the video. And at the very end, what appears to be the child is dead.

Q. The user of the iPad searches for Daisy's Destruction and also specifically for the audio, do you see that?

A. Yes.

Q. Have you heard the associated audio?

A. Unfortunately, yes.

Q. What's it like?

A. She's screaming all throughout.

Q. Who is "she"?

A. The toddler victim.

Q. Did the user of the iPad also search for Peter Scully?

A. Yes.

Q. What does that name mean to you?

A. Peter Scully is found to be the producer of Daisy's Destruction.

Q. Do you see on the list the term "blood sign"?

A. I do.

Q. Are you aware of a connection between that term and the Numbers 764?

A. Yes.

Q. What is 764?

A. So 764 is a group -- it's an offshoot. There's so many different names within the groups. They have different names now, but the collective term within 764 is referring to a group of individuals who is trying to cause chaos throughout society in multiple ways, whether it be forms of mass shooting or causing exploitation of children.

And one of the best ways to describe it in plain terms is within that exploitation of children is that you can take like self-harm and self-mutilation of an individual and CSAM and marry the two, and it has to do with the control that the individuals, the subjects of these cases, the individuals are trying to have on the victim whenever you bleed for the subject or for that person that you have asked for.

Q. I just want to go back and take that apart a little bit. I think you said the 764 victims are children?

A. Generally, yes.

Q. And they are induced or coerced to do what?

A. So there's a wide range, but they're coerced to mark on their bodies. And sometimes it's just a simple cut and then blood, and delving into what that blood sign is is you can take that blood and write on their body or write on something.

And there's also ones where you actually -- they're asked to carve names, generally either actual names or monikers, into the victim's body and then send nude images within that. So they might write on their thighs, and they might be nude doing it or their stomach or their arms or their chest. Then they send those images, and that is a sense of control for the subject. But it is required to get into those groups, those types of images, and it's called content.

Q. Did you find items on Harding's iPad that related to 764?

A. I did.

Q. I want to show you what's marked as Government's Exhibit M.

MR. BENGEL: Your Honor, can we display this?

THE COURT: M, yes, and N, no. I have the book in front of me. Defense Counsel has the book. That's sufficient.

BY MR. BENGEL:

Q. Do you recognize the photo that's Government's Exhibit M?

A. I do.

Q. What is it?

A. This is an image that was found on Harding's device.

Q. And can you describe what you see and what it means to you?

A. Sure. So that is a Leviathan cross. It's part of 764 in the way that their symbol is, and it has to do with the beginning portion of where they talk about how -- like the origin of it is through Satanists. NSK is God.

This is referring to a subject specifically within 764, and then this type of like wording "I sold my soul to 764. I pledge allegiance to 764," that is very typical of what we see written on the victims or within the 764 group.

And generally, as you can see, it's written in a red fluid which in most cases here is blood, and it has been used from the cuts that they have created on their body to create these types of images. And you see a Nazi symbol there as well because there's an origin of it within the neo-Nazis.

MR. BENGEL: Your Honor, I move to admit Government's Exhibit M.

THE COURT: Same objection, Counsel?

MR. CAPOZZI: Judge, I think it's probably relevant to the CSAM charge. I'm not sure yet because I don't know if this is the entire photograph or it's been cropped. I was frankly going to inquire. Maybe Mr. Bengel can do that.

Is there more to the photographs, something that

depicts a person?

THE COURT: Why don't you save that for cross-examination.

Do you have an objection at this moment for its admission?

MR. CAPOZZI: Yes, lack of foundation.

THE COURT: Overruled. It's admitted.

MR. BENGEL: Your Honor, may I approach with copies of Government's Exhibit N and O?

THE COURT: I have copies.

MR. BENGEL: I want to give them to the witness.

THE COURT: Yes, please.

BY MR. BENGEL:

Q. Agent, can you please take a look at the document in front of you that's marked as Exhibit N?

A. Yes.

Q. Do you recognize it?

A. I do.

Q. What is it?

A. That is an image found on Harding's device.

MR. BENGEL: Your Honor, first, I'll move to admit Government's Exhibit N.

THE COURT: Counsel?

MR. CAPOZZI: Same objection, Judge.

THE COURT: Overruled. Admitted.

BY MR. BENGEL:

Q. Can you please describe the image and how it relates to the 764 movement?

A. Yes. So this is an individual female that has -- above her breasts, she has what appears to be a blood sign that states, "No Lives Matter" carved into her, and there is blood all over. It's symbolizing blood.

In these cases, it could be real blood or a red substance, but the whole point of it again goes into them bleeding for the individual. And that "No Lives Matter" is a phrase they use frequently throughout things. They also use it to title certain what they call kill sprees throughout the country and abroad.

Q. Now, can I ask you to take a look at Exhibit O?

A. Yes.

Q. Do you recognize that?

A. Yes.

Q. What is it?

A. Also an image found on Harding's device.

MR. BENGEL: Move to admit Government's Exhibit O, Your Honor.

MR. CAPOZZI: Same objection.

THE COURT: Overruled. It's admitted.

BY MR. BENGEL:

Q. Without saying out loud the specific name, can you please

describe the image?

A. Similar in fashion of showing that, above the breast of an individual, there is a name carved into the chest, and that is the name of a known victim within the 764 realm.

Q. Agent, the couple of images that we just looked at, do they represent everything that you saw on the iPad concerning the abuse of children?

A. No.

Q. Can you please summarize some of the additional material?

A. Sure. There were several images, one of which was a -- seemed to be a compilation of images that it was like a four by four in which there were toddlers in each frame that appeared to be different toddlers, and they were being harmed in some fashion. Some were nude. Some had some clothing on. They appeared to be harmed in some fashion.

There was a video in which individuals or young children -- definitely prepubescent females and males -- were being harmed throughout the video. There was also several images throughout. Some were older than babies but appeared to be under the age of 18, and then some were also over the age of 18 in which the body was mutilated in some fashion, arms cut off, necks sliced. Some of them were nude. Some of them were clothed.

There was one individual that was decapitated. It was a female, and she was being vaginally penetrated. Those types

of images were all over Harding's devices, iPad and iPhone.

Q. I think you mentioned the iPhone. There was an iPhone seized from Harding's bedside table during the December 11th search?

A. Yes.

Q. And that device is now being analyzed?

A. Yes.

Q. Does it contain additional evidence relative to the FBI's investigation?

A. Yes.

MR. BENGEL: Can we see what has been marked as Government's Exhibit P?

BY MR. BENGEL:

Q. Let's expand the information bar at the top. Do you recognize this?

A. I do.

Q. What is it?

A. This is from the iPhone. This is messages.

Q. Do you know what app they're associated with?

A. Telegram.

Q. What do you know about Telegram?

A. Telegram is a widely used app within the group of 764, messaging app.

Q. Is it encrypted?

A. Yes.

Q. Believed to be private from law enforcement?

A. Believed to be, yes.

Q. So one member of this chat is the owner of the phone, and the other is using the name MissBlackDaisy; is that correct?

A. That is correct.

MR. BENGEL: Can we please move to Page 2?

BY MR. BENGEL:

Q. I'm going to ask you to read the first green message at the top of Page 2.

A. "Me neither tbh, it fucking sucks. I hope one day I'll find someone but idk, maybe I'll turn into Elliot Rodger but less cringe and narcissistic."

Q. What's the date associated with this?

A. That is 10/17/2024 at 7:00 p.m.

Q. And that's sent by the owner of the device?

A. That's correct.

Q. Do you know who Elliot Rodger is?

A. Yes.

Q. Who is he?

A. He murdered individuals in 2014.

Q. Do you know what an "incel" is?

A. Yes.

Q. What is it?

A. So it means involuntarily celibate.

Q. Are you aware of any connection between, quote, "incels"

and Elliot Rodger?

A.   Yes.   It's stated that Elliot Rodger is a part of what's the incel movement in which individuals that are involuntarily celibate cause problems in society.

MR. BENGEL:   Can we please move to Page 9?   Can we please expand the group messaging green starts with "Yea, I know"?

BY MR. BENGEL:

Q.   Can you please read that message?

A.   "Yea, I know that too but unfortunately that made me what I am today, I used to just be suicidal, when I came to that conclusion myself it made me hateful and wanting to destroy all of humanity."

Q.   This is also a message sent by the owner of the device in October 2024?

A.   Yes.

MR. BENGEL:   Can we please move to Page 16?

BY MR. BENGEL:

Q.   And I'm going to ask you to read the two messages in green.

A.   "But that's the thing I don't wanna be on this evil planet anymore.

     And on top of that I want them all to suffer as I did."

Q.   When were these messages sent?

A.   10/29/2024.

Q.   Also by the owner of the device?

A.   Yes.

Q.   As part of the preparation for this hearing, did an FBI analyst compile a list of videos contained on Harding's device in which individuals were murdered?

A.   Yes.

Q.   Does Harding's iPhone contain a 13-minute video from the Tops grocery store mass shooting in Buffalo in which approximately ten people were murdered?

A.   Yes.

Q.   Does it contain a security video from a 2023 school shooting in Nashville in which approximately six people were murdered?

A.   Yes.

Q.   Does it contain a video from the 2013 Nairobi mall shooting in which approximately 67 people were murdered?

A.   Yes.

Q.   Does it contain security footage from the Columbine shooting?

A.   Yes.

Q.   Did the FBI analyst count videos on Harding's device that contained violence, including beheadings, rape, or torture?

A.   Yes.

Q.   How many did she count?

A.   Over 50 I believe.

Q. Many of these massacres we just discussed were committed with firearms, correct?

A. Correct.

Q. As part of the investigation of Harding, did FBI install a pole camera outside his house?

A. They did.

Q. That's the same house that was searched on December 11th?

A. Yes, that's correct.

Q. I want to show you what's been marked as Government's Exhibit S.

MR. BENGEL: Let's pause it at the first frame.

THE COURT: Attorney Bengel, did you move to admit the previous exhibit?

MR. BENGEL: If I did not, Your Honor, I move to admit Government's Exhibit P. Thank you.

THE COURT: Counsel?

MR. CAPOZZI: Objection, Judge. I don't believe it's relevant.

THE COURT: Overruled. It's admitted.

BY MR. BENGEL:

Q. Agent, do you know what the date of the video that's Government's Exhibit S is?

A. I believe it was the 29th.

Q. Of --

A. January.

Q. Of this year?

A. Yes.

Q. And that was the date of Aidan Harding's initial appearance?

A. That's correct.

Q. About what time of day is this video?

A. This is later in the afternoon, somewhere around 4:00 or 5:00 I believe.

MR. BENGEL: Your Honor, move to admit Government's Exhibit S.

THE COURT: Counsel?

MR. CAPOZZI: No objection.

THE COURT: It's admitted.

MR. BENGEL: We can hit play, please.

(Whereupon, the videotape is played in open court.)

BY MR. BENGEL:

Q. Agent, what did you see in that video?

A. So that is Harding's residence. I saw Harding's mother exit the residence holding what appears to be a rifle and placing it in her Jeep as well as -- that other vehicle is Noah Cron's car.

MR. BENGEL: Let's look at Government's Exhibit T, please.

BY MR. BENGEL:

Q. Do you know that Government's Exhibit T was also a video

from that same pole camera?

A. Yes.

Q. And what's the date associated with Government's Exhibit T?

A. The same date.

Q. Same time of day?

A. Yes, not long after the first one.

MR. BENGEL: Your Honor, move to admit Government's Exhibit T.

MR. CAPOZZI: No objection, Judge.

THE COURT: It's admitted.

MR. BENGEL: We can play, please.

(Whereupon, the videotape is played in open court.)

BY MR. BENGEL:

Q. Agent, what did you see in this video?

A. I saw Noah Cron exiting the Harding residence holding a rifle and placing it in his vehicle.

Q. And Aidan Harding's mother's car is still there?

A. Yes.

Q. As part of the investigation, have agents identified additional evidence concerning Harding's interest in the Columbine murders?

A. Yes.

Q. Let me show you what's been marked as Government's Exhibit

Q. Do you recognize this?

A. I do.

Q. What is this?

A. This is an image of the search warrant of the residence.

Q. The drawings, what do they mean to you?

A. So those are found obviously at the home. Those drawings depict the shooters of Columbine.

MR. BENGEL: Your Honor, move to admit Government's Exhibit Q.

MR. CAPOZZI: Same objection, Judge.

THE COURT: They're admitted. Overruled.

MR. BENGEL: Can we now see Government's Exhibit R?

BY MR. BENGEL:

Q. Do you recognize this?

A. I do.

Q. What is it?

A. This is a picture of Aidan Harding on the left and Noah Cron on the right, and they are with a Nazi flag in the background. And they are dressed as the Columbine shooters.

Q. Same clothes depicted in the drawing?

A. Yes.

MR. BENGEL: Your Honor, move to admit Government's Exhibit R.

MR. CAPOZZI: Same objection, Judge.

THE COURT: It's admitted. Overruled.

BY MR. BENGEL:

Q. Were there any photos on Aidan Harding's phone indicating he had actually visited Columbine?

A. Yes.

MR. BENGEL: Can we load up what is marked as Government's Exhibit U?

BY MR. BENGEL:

Q. Have you watched this before?

A. I have.

Q. Where did it come from?

A. This came from Harding's phone.

Q. And what's the setting of this video?

A. This is at whenever he visited Columbine at the memorial.

Q. And who's in the video?

A. Noah Cron and Aidan Harding.

MR. BENGEL: Your Honor, move to admit Government's Exhibit U.

MR. CAPOZZI: Same objection, Judge.

THE COURT: All right. It's overruled. It's admitted.

MR. BENGEL: If we could play it, please.

(Whereupon, the videotape is played in open court.)

BY MR. BENGEL:

Q. So, agent, I know the Court watched it. I don't want you to summarize everything. There's a part of the video where Harding and Cron do a salute. What is that?

A. That is generally known as the Heil Hitler salute.

Q. In preparing for today's hearing, did you become familiar with a charity called Rachel's Challenge?

A. Yes.

MR. BENGEL: Can we please see Exhibit Y?

BY MR. BENGEL:

Q. Do you recognize this as a screenshot from the Rachel's Challenge website?

A. Yes.

Q. Just to summarize, it's an organization formed by the family of a Columbine victim; is that correct?

A. Correct.

Q. Rachel is the victim?

A. Yes.

Q. And her father is Darryl Scott. Do you see that?

A. I do.

MR. BENGEL: Your Honor, move to admit Government's Exhibit Y.

MR. CAPOZZI: I don't believe it's relevant. It hasn't been established, Judge.

THE COURT: I think I understand the point that he's making. I'm going to overrule the objection and admit it.

BY MR. BENGEL:

Q. Did agents find evidence concerning the Rachel's Challenge on Harding's iPhone?

A.  Yes.

MR. BENGEL:  Can we please see what's been marked as Government's Exhibit V?

BY MR. BENGEL:

Q.  Where did this come from?

A.  This came from Harding's iPhone.

Q.  And do you recognize that person as Aidan Harding?

A.  I do.

MR. BENGEL:  Your Honor, move to admit Government's Exhibit V.

THE COURT:  Any objection?

MR. CAPOZZI:  Relevance, Judge.

THE COURT:  What's the relevance?

BY MR. BENGEL:

Q.  In a very general way, what is in the video?

A.  In this video, he is describing Rachel's Challenge in his words, and then he received a shirt that references it and then urinates on the shirt.  That's part one.

MR. BENGEL:  Your Honor, move to admit Government's Exhibit V.

THE COURT:  Objection?

MR. CAPOZZI:  Relevance.

THE COURT:  I find it's relevant.  I'm going to overrule the objection and admit it.

MR. BENGEL:  We can play it, please.

(Whereupon, the videotape is played in open court.)

BY MR. BENGEL:

Q.  Agent, I don't want you to summarize everything.  You heard the reference in there of Papa Scott, right?

A.  Yes.

Q.  Do you understand that to be a reference to Rachel's father?

A.  Yes.

Q.  Is there a Part 2 of this video?

A.  There is.

MR. BENGEL:  Can we please see what's marked as Exhibit W?

BY MR. BENGEL:

Q.  Do you recognize this as Part 2 of the video concerning the Rachel's Challenge shirt?

A.  I do.

MR. BENGEL:  Your Honor, move to admit Government's Exhibit W.

MR. CAPOZZI:  Same objection.

THE COURT:  Overruled.  It's admitted.

MR. BENGEL:  Go ahead.

(Whereupon, the videotape is played in open court.)

MR. BENGEL:  Can we please see Government's Exhibit X?

BY MR. BENGEL:

Q. Agent, have you watched this before?

A. Yes.

Q. Where was this found?

A. This was found on the iPhone.

MR. BENGEL: Your Honor, move to admit Government's Exhibit X.

MR. CAPOZZI: Same objection, Judge.

THE COURT: Can you just proffer what the basis for this exhibit is?

BY MR. BENGEL:

Q. Is there an individual speaking and firing a gun in this video?

A. Yes.

Q. Who do you believe that individual is?

A. I believe that is Aidan Harding.

THE COURT: Overruled. It's admitted.

(Whereupon, the videotape is played in open court.)

MR. BENGEL: Pass the witness, Your Honor.

THE COURT: You done?

MR. BENGEL: (Counsel nods.)

THE COURT: Counsel, cross?

MR. CAPOZZI: Judge, do you want to take a break?

THE COURT: Yes. It's now 12:00 o'clock. Why don't we come back at 12:10.

(A recess was taken.)

THE COURT: Attorney Capozzi, proceed.

CROSS-EXAMINATION

BY MR. CAPOZZI:

Q. Agent Scott, good afternoon.

A. Good afternoon, sir.

Q. It is Scott, correct?

A. It is.

Q. If at any point today you don't hear one of my questions, will you let me know?

A. I absolutely will.

Q. If you don't understand one of my questions, will you let me know?

A. I will.

Q. I want to go back to Government's Exhibit A, Page 13 of 37.

THE COURT: To clarify, that is 13 of 37?

MR. CAPOZZI: Yes, Judge.

BY MR. CAPOZZI:

Q. Am I correct, agent, that Meta Facebook made a disclosure to the Federal Bureau of Investigation on October 15th of 2024, correct?

A. That is correct.

Q. Would that disclosure have been made directly to FBI Pittsburgh?

A. That is what it appears, yes.

Q. And the search warrant at Mr. Harding's residence was executed by the Joint Terrorism Task Force on December 10th of 2024?

A. I believe it was December 11th.

Q. What was going on between October 15th and December 11th was this Joint Terrorism Task Force investigation, correct?

A. That is correct.

Q. So they were reviewing the materials that had been received from Facebook Meta, correct?

A. That is what it appears in the affidavit, yes.

Q. They also would have been collecting information, background information, on Mr. Harding, correct?

A. Yes.

Q. For instance, his juvenile court records, correct?

A. Correct.

Q. They also set up a pole camera, correct?

A. They did set up a pole camera.

Q. Do you know when that pole camera was set up?

A. I do not.

Q. Paragraphs 17 through it appears 42 summarizes what is called the investigation background, correct?

A. Yes.

Q. Going to Paragraph 18 on Page 13 of 37, that concerns a message on April 5th of 2024, correct?

A. Yes.

Q. And that's not necessarily the complete message that we see there in the table of Paragraph 18. Rather, those are the portions that had been included in the affidavit of probable cause?

A. I do not know if it's in total or if there's additional messages.

Q. And then, the next item or message that is referenced is on August 20, 2024, in Paragraph 19, correct?

A. Yes.

Q. And then, as you look at the table on Page 14 of 37, it would appear that there are two messages and then some ellipses. Do you see that?

A. Yes.

Q. Would that indicate that some message or messages have been omitted?

A. That is the general indication, yes.

Q. This would not generally be the entire conversation, right?

A. Not likely.

Q. And then, in terms of the part of that message you reviewed, which is the third block in the table, there's no specific threat within that block, is there?

A. Within which block specifically?

Q. The third one down.

A. Beginning with "Yes that's"?

Q. Yes.

A. He just names what he does.

Q. Thank you. The next paragraph that I want to take a look at is Paragraph 20. That references communications on August 28th of 2024; is that right?

A. I see that.

Q. The pole camera that was up, was it monitored, or was it reviewed?

A. I do not know all of the aspects of the pole camera as far as who was sitting, watching it at what time.

Q. You can tell us, though, that nothing that was observed on that pole camera, either in realtime or upon a subsequent review, caused the FBI to expedite its investigation in this case and act immediately; am I right about that?

A. I can't answer that question about that as far as if anything that they saw caused immediacy or emergency in their eyes.

Q. The next date that's referenced is sharing images on September 26th of 2024, correct?

A. Where is that referenced?

Q. Oh, I'm sorry. Thank you so much. Paragraph 22, Page 15 of 37.

A. Could you repeat the question?

Q. Sure. The next messaging or item that is referenced in the affidavit is sharing images on September 26th of 2024,

correct?

A. That is correct.

Q. And then September 29th of 2024, correct?

A. That is a video, yes.

Q. And neither of these would be classified as child sexual abuse materials; am I right?

A. In the totality I am looking at, that is not child sexual abuse material listed.

Q. In Paragraph 24, there's a reference to a Pittsburgh Police investigation where they recovered a video, right?

A. Yes.

Q. Is that information received from Facebook Meta, or is that part of the collateral investigation? Do you know?

A. Which portion are you asking about specifically?

Q. In Paragraph 24.

A. They recovered that banner. So that's the reference in 20 -- in Paragraph 24 is they recovered those banners.

Q. My question is "Is that from the Facebook Meta information, or is that part of the collateral information?"

A. That is part of the investigation within the Pittsburgh Police report.

Q. That would have been information obtained or developed from those reports from the Joint Terrorism Task Force?

A. Yes.

Q. On September 27th of 2024, Mr. Harding was arrested and

charged with criminal mischief by the South Park Police after a spray-painting incident, correct?

A. That's correct.

Q. And that would have also been information that was developed by the Joint Terrorism Task Force in its collateral information?

A. Yes.

Q. That was resolved at the Magisterial District Court level, correct?

A. Which one specifically?

Q. The criminal mischief case filed by South Park Township.

A. I know the filing. I do not know the end result.

THE COURT: Agent, can I ask that you push the microphone back? It's been popping.

THE WITNESS: My apologies, Your Honor.

Does that sound better?

THE COURT: Yes.

BY MR. CAPOZZI:

Q. On September 8th of 2024, there is reference -- this is Paragraph 26 on Page 16 of 37 -- to another message, correct?

A. Yes.

Q. And then October 2nd of 2024, that's a reference to another message, correct?

A. Yes, that is correct.

Q. And those are both information developed from Facebook,

Instagram -- excuse me, Facebook Meta?

A.   Instagram.  Those are both from Instagram is what it appears to be.

Q.   And Instagram is a Meta company?

A.   It is a Meta company.

Q.   Do you know when the Joint Terrorism Task Force started looking at the information it had received from Facebook Meta?

A.   I do not.

Q.   All we know is that it was sometime between when it was received in October and the search warrant and when the search warrant was executed in December, correct?

A.   I did not confirm exact dates in which they reviewed the material received from Meta.

Q.   But we can identify a timeframe, correct?

A.   That it was before likely the search.  That is all I can confirm for you.

Q.   I now want to go to some historical information on Mr. Harding that begins in Paragraph 43 on Page 25 of 37.  I want to focus in particular on the table that begins on Page 25 in Paragraph 44 and continues on to Page 26 and then 27.

     Rebel, who you've identified as Mr. Harding, correct?

A.   That's correct.

Q.   And the very first message or post he indicates -- and this is in 2019, right?

A. That's correct.

Q. So it's more than five years before the FBI receives its current information, right?

A. It was in 2019.

Q. Which would be more than five years before the FBI receives its current information, correct?

A. I don't know when they started receiving the information. So it could be around that time or slightly before.

Q. Well, we know that they received the current information on October 15th of 2024, right?

A. That is what that portion of the affidavit states. I cannot speak on anything else they have received.

Q. What he indicates in that first line is "I used" -- U-S-E-D -- "to have a plan"?

A. Correct.

Q. As in past tense?

A. That's how you would say it, yes.

Q. On Page 26 of 37 in the fifth full block down, the first line reads, "I had an awesome plan," correct?

A. Yes.

Q. And again, "had" as in past tense?

A. That is a past tense word, yes.

Q. And then, in the eighth block down, the eighth full block down on the same page, Rebel writes, "But I was gonna do it when I'm like 19 or 21," right?

A. That's correct.

Q. Again, past tense, right?

A. "Was" is a past tense word, yes.

Q. The affidavit then goes on to discuss the Peters Township Police becoming involved, right?

A. Where is that?

Q. This is on Page 27 of 37 in Paragraphs 45 through 48.

A. I see that.

Q. And ultimately, this is the case where Mr. Harding was adjudicated delinquent to terroristic threats, correct?

A. Yes, that is correct.

Q. And when he was adjudicated delinquent of terroristic threats, at least in Pennsylvania, that's a misdemeanor, correct?

A. I can't speak on the actual charges on state level.

THE COURT: The Court will take judicial notice. I know the grading of the offense.

MR. CAPOZZI: As the Court is aware, it's a misdemeanor of the first degree.

THE COURT: Yes.

BY MR. CAPOZZI:

Q. A sentence was imposed, and Mr. Harding served that sentence, correct?

A. I'm not aware of his criminal charges after the charge occurred as far as the time spent in prison or jail.

Q. Well, I'm talking about this particular juvenile case and its disposition. He was adjudicated delinquent?

A. Yes.

Q. And then, a sentence was imposed, correct?

A. I do not know what happened after he was charged as an adjudicated delinquent.

Q. Very good. Let's go to Exhibit B. Have you had an opportunity to see it?

A. I have.

Q. In the lower right-hand corner, there appears to be what's referred to as a Terrible Towel; is that right?

A. That's what it looks like to me.

Q. And by the way, Exhibits B through K, none of those are related to child sexual abuse material, are they?

A. I would have to see the exhibits one more time to confirm that information.

Q. We'll go through them.

A. Okay.

Q. We can agree on Exhibit B that there's a Terrible Towel on the lower right-hand corner of that photograph, right?

A. That's what it looks like to me.

Q. Then on Exhibit C, it appears that -- take a look at Exhibit C. Let me know when you're finished.

A. I see it.

Q. There appears to be a computer setup and two chairs in

whatever room of the house that is, correct?

A. Correct.

Q. Those are commonly known as gaming chairs, correct?

A. That is correct.

Q. Let's take a look at Exhibit D. When you're finished, let me know, and we'll go on to Exhibit E.

A. Finished.

Q. E, let us know when you're finished.

A. Done.

Q. F, let us know when you're finished.

A. Done.

Q. G, let us know when you're finished.

A. Did you say G?

Q. I did say G as in George.

A. Done.

MR. CAPOZZI: Not quite ready. Sorry about that.

BY MR. CAPOZZI:

Q. These items that are depicted here, is that how they were at Mr. Harding's home, or were they collected, put on the floor or a table, and a photograph taken?

A. It is my understanding they were collected.

Q. Let's go to Exhibit H as in Henry, and let us know when you have had an opportunity to look at that.

A. I see it.

Q. And with respect to Exhibit H, are these also materials

that were collected and then a photograph taken?

A. It is my understanding they were collected.

Q. And then Exhibit I, let us know when you have had an opportunity to take a look at that.

A. Completed.

Q. I want to focus on a couple of things in the center of the photograph. One is a poster that appears to have the word "doom" on it, D-O-O-M, and I think at the bottom of the poster it says "id," I-D. Do you see that?

A. I do see that.

Q. That is a poster of a video game?

A. I cannot confirm that information.

Q. Immediately above the exhibit numbers is what appears to me to be a Blackjack Pizza & Salad box; is that right?

A. I see the Blackjack Pizza. I can't confirm it's a salad box.

Q. It says Blackjack Pizza & Salads and a box?

A. I see the image. I can't confirm that's a box.

Q. And then Exhibit J, let me know when you have looked at that one.

A. I see it.

Q. And then Exhibit K, let me know when you have looked at that one.

A. I see it.

Q. You have had an opportunity to look at B through K again?

A. Yes.

Q. Are any of those child sexual abuse material?

A. In the totality, if you want an opinion, when it refers to child sexual abuse material, you have to consider the 764 individuals and those individuals who have information within the CSAM, if you don't mind me abbreviating --

Q. I don't.

A. -- and their exploitation of minors. Some of them use the Nazi symbol. That would be the only thing that would be relevant in the CSAM world, as we call it, in those images.

Q. Other than the Nazi symbol, there's nothing else that would be relevant to a CSAM assessment, correct?

A. Not that I saw.

Q. And with respect to the Nazi symbol, that's used by any number of groups other than 764, correct?

A. I'm sure others use it, yes.

Q. I'd like to take a look at Exhibit M, please. You have an opportunity to look at that one again?

A. Yes.

Q. Is that the entire image that was on Mr. Harding's phone?

A. Yes. The only thing that could have -- may have been cropped was a white portion, but as far as the relevant information or any type of substantive information, yes, that is the total image.

Q. And that image, are you able to tell from the forensic

analysis of the phone whether it was a screenshot or if it was downloaded?

A. I am not a forensic expert and cannot answer that question.

Q. Are you able to tell us when it was either screen -- I'm using the word "screenshotted" which I'm not sure is a word -- but do you understand what I mean by that?

A. I do.

Q. Can we use that?

A. Yes.

Q. Are you able to tell us when it was screenshotted or a screenshot -- I got it. Can you tell us when a screenshot was taken or when it was downloaded?

A. No. I'm not able to say that information.

Q. Is that information available to us?

A. The information as far as the metadata available is part of the availability of view, for sure.

Q. But that's not information that you have access to today?

A. That's correct.

Q. So they could have been downloaded sometime ago or they could have been -- screenshots could have been taken sometime ago?

A. I cannot answer that question.

Q. Well, you can't tell us when they were taken, right?

A. That's correct.

Q. Unless -- this was an item that was actually found in the phone or within a deleted part of the phone I think it's called maybe. I'm not sure what it is. It's actually a partition but some deleted part of the phone. Do you know?

A. This was found when the phone was forensically analyzed. As far as anything else, I am not an expert and therefore cannot speak on it.

Q. Exhibit N --

MR. CAPOZZI: And I don't think Exhibit N is supposed to be displayed to the room.

Am I right, Judge?

THE COURT: You're right. I have a copy up here.

MR. CAPOZZI: May I approach, Judge?

THE COURT: Please.

BY MR. CAPOZZI:

Q. Exhibit N, you previously reviewed that, and you have had an opportunity to review it again?

A. Yes.

Q. Is that the entire image, or is it cropped?

A. If I recall, that is the entire image.

Q. Are you able to tell from that image whether or not the person depicted in that image is under the age of 18?

A. I am not.

Q. Let's go to Exhibit O which also is not displayed. Have you had an opportunity to look at that one again? Please let

us know.

A.   Yes, I have.

Q.   Is that the entire image?

A.   Yes.

Q.   And are you able to tell us from looking at that image whether or not that is an image of a person under the age of 18?

A.   While I cannot confirm that that female in the image is under the age of 18, the person named on the chest was under 18 when they were victimized.

Q.   Is this an image of the person that was victimized?

A.   I cannot confirm that information.

Q.   With respect to Exhibits N and O, are you able to tell us when that screenshot was taken or that image was downloaded?

A.   Again, I cannot.

Q.   And these images don't depict what I'm going refer to as a sexual or intimate part of another person's body, in particular the breasts or the areola; is that right?

A.   These images specifically do not show any type of nudity specifically.  As far as understanding that, it still goes into the victimization that is covered under 764 and what we know of 764.

Q.   To be -- that's an assessment for the Judge to make. Going to what's been marked as Exhibit L which is the criminal complaint and the affidavit of probable cause.

MR. CAPOZZI: If you could pull that up please, Mr. Flannigan.

BY MR. CAPOZZI:

Q. And proceeding to Page 8 of 11 of the affidavit of probable cause. Let us know when you have had an opportunity to review it again.

A. I see the page.

Q. Focussing on Paragraph 21, did you personally locate those search terms within Mr. Harding's device?

A. Yes, I did.

Q. Are you able to tell us when those searches were undertaken?

A. I do not recall each date those were searched.

Q. You do not recall or you do not know? I'm sorry. I'm not sure I heard your answer.

A. That's not a problem. The dates within the device may be listed there. I don't recall the dates.

Q. And then, there was a search. You offered some testimony around the term Daisy's Destruction and what daisy'sdestruction.com is.

A. I spoke on Daisy's Destruction, yes.

Q. Was that video downloaded?

A. We have not completed our analysis of the devices, so I can't confirm or deny that information. I cannot say a firm yes or no.

Q. As of today?

A. As of today, I have not found evidence of that as of yet.

Q. And then, there's a reference to a novel -- we'll come back to that. To be clear, Mr. Harding's been charged with a single count of CSAM, correct?

A. Single count of possession of CSAM, yes.

Q. Thank you. Not production, correct?

A. He has not been charged with production as of this date.

Q. And not dissemination, correct?

A. Not as of this date.

Q. You indicated in your affidavit that he implied he would shoot Jewish people. Do you remember that?

A. If you would like to bring up the affidavit, we can discuss what I have said.

Q. Sure.

MR. CAPOZZI: If you could bring up Exhibit L again. I'll find it in a moment. I'll come back to it.

BY MR. CAPOZZI:

Q. Mr. Harding's iPhone was seized, correct?

A. That's correct.

Q. And an iPad was seized?

A. That's correct.

Q. And if those items are both synced to the iCloud, what is on one is on the other, correct?

A. It depends on how the settings are.

Q. Do you know whether or not the settings in this case were such that what was on one device was on the other?

A. I don't know that information.

Q. You mentioned at some point in your testimony when you see this type of imagery on these devices -- do you remember testifying about that?

A. I do.

Q. I hate to do this, but exactly what your point was there?

A. When we speak on individuals with this type of imagery, they may have it across devices -- may not be the same images or videos -- but they usually carry it across devices for accessibility.

Q. In this case, was it the same imagery across devices?

A. I have not found the exact same imagery on the iPad as I have on the iPhone with the exception of the one video that I have already testified to that was also located on the iPhone, named a different name, but it was the same video.

Q. Are there images on the iPad that are not on the iPhone and images on the iPhone -- including videos -- that are not on the iPad?

A. Thus far, that is correct. However, you have to understand that we have not completed our analysis of the device, and I cannot confirm that the images on the iPad are not on the iPhone and vice versa given there are over 200,000 images on that iPhone alone for us to go through.

Q. Very good. Were these devices password protected?

A. I believe that some of them are, but I could not confirm whether they all are password protected or not.

Q. Am I correct that Aidan was asked for his password?

A. He was on some of them, yes.

Q. And that he provided his password?

A. I believe he provided some of them. I can't again confirm whether he provided all the passcodes or not.

Q. And these devices were located in his home, correct?

A. Yes.

Q. You mentioned a roommate; is that right?

A. I mentioned somebody that was there during the search.

Q. And that same person was still there on January 29th of 2025, correct?

A. That person was seen entering -- my apologies -- exiting the home. That is what I can confirm about that individual, can't confirm about staying at the residence.

Q. To be clear, he was seen exiting the home with a firearm or what appears to be a firearm and then going back into the home, correct?

A. That's correct.

Q. Were these devices kept under lock and key at Mr. Harding's home to your knowledge?

A. To my knowledge, the iPhone and the iPad were kept on the nightstand in his room. The other ones, I do not know exactly

where they are or where they were.

Q. Was the room secured from the rest of the house? That is, did it have a lock on the door that it could be set from?

A. I do not know if there was a lock on the door.

Q. Now, a forensic examination, can you tell us -- that's an after-the-fact review or analysis of information on an iPhone, correct?

A. That's a pretty good description, yes, sir.

Q. Oftentimes, when you're looking at a phone or an iPhone, you can get date, time, if it's a telephone call or communication, the direction of the communication depending on the nature of the communication, its duration, right?

A. Depending on the type of download and analysis, yes.

Q. And perhaps content?

A. Potentially.

Q. What we can't tell from a forensic examination is who is conducting the searches?

A. The individual having the device would be conducting the searches.

Q. But you can't necessarily say "Because it's Chris Capozzi's telephone, it was Chris Capozzi who was trying to find the Penn State basketball score on his phone last night"?

A. When we review a forensic device, I can't confirm who is behind it, but I can confirm whose cloud it is and who has access if there is a password so to speak.

Q. There's no question that these devices are associated with Mr. Harding, is there?

A. There isn't.

Q. But again, you can't necessarily tell, as you say, who's behind the device literally -- let's say at the keyboard because I'm an old guy -- at the keyboard typing in the searches, right?

A. We cannot confirm specifically, but you can go through other investigative steps potentially to find out information.

Q. And you can't necessarily tell who was downloading data, right?

A. Again, the individual having the device.

Q. And you can't necessarily tell who was taking screenshots?

A. Again, the individual having the device.

Q. Then going back -- if you need to look at them again, we can look at them again -- Exhibits N and O as well as Exhibit M. Do you need to see them again or no?

A. Yes, go ahead and pull that up for me, please. I got it.

Q. Can you tell us from your investigation whether these are computer-generated images or CGI? Can you rule out that they are computer-generated images?

A. I cannot say that they are, and I can't say that they aren't.

Q. From the metadata, can you tell us where the device was when these items were downloaded?

A. Can you rephrase that question?

Q. Sure. Particularly with Apple products, sometimes it has geolocation information, right?

A. Sure.

Q. For instance, I will represent to you this is an Apple iPhone. It's probably an 8 or a 9, but let's say it's a more modern iPhone like a 15.

A. Sure.

Q. Even with an 8 or 9, it may have a geolocation feature?

A. Sure.

Q. When a photograph is taken or an image is downloaded, the location where that photograph is taken or that image is downloaded might be imbedded within the image itself or the video itself, correct?

A. It might be.

Q. Was that -- has an examination of that sort been conducted in this case, and if so, can you tell us where that item was, where that device was, and where the photographs were taken or the image was downloaded?

A. The investigation on those devices is still ongoing. I cannot answer that question at this time.

Q. Do you have any evidence that any of the items you have identified today or even -- that any of the items you've identified here today have been reposted or retransmitted from a device that you can trace or assign to Mr. Harding?

A. Can you rephrase that question, please?

Q. Sure. Can you tell us whether or not either M, N, or O has been retransmitted or reposted by a device assigned to Mr. Harding?

A. I can't confirm that information as we're still going through our investigation.

Q. The communications that we went through, do they evince a threat to a specific person?

A. We went through a lot of communication. Would you like to specifically pin down which one you are referring to?

Q. You are investigating the case, right?

A. I am part of the investigation.

Q. And you've looked at these materials before we came today, correct?

A. Correct.

Q. And you had an opportunity to look at at least some of them while we were here today?

A. Correct.

Q. Do you have a memory of there being a threat to a specific person within any of the materials that you've reviewed in this case?

A. Would you say that he said "I'll never shoot y'all. You're not a Jew," as not a threat?

Q. I'm asking you the question.

A. I can't say after reading those messages that there's not

threatening communication within them.

Q. Was there a threat to a specific person?

A. A specific named person or type of individual?

Q. Well, let's start with named person.

A. In the affidavit itself and what we have reviewed today, there is not a specific name that I recall.

Q. Nor a specific place?

A. There are references to places that Harding was interested in. As far as him saying something specific within that, there is not. However, he speaks on places and on shootings.

Q. Is it a threat, for instance, to go back to Columbine and commit a shooting there? Is that what you're suggesting?

A. That's not good.

Q. What did you say?

A. I said it's not good, obviously.

Q. It would not be. Are you saying you are able to tease out of the information before you that he's made a threat to a specific school or church or synagogue or mosque?

A. Thank you for clarifying. No. Specifically, he has not stated such information as of right now that I have reviewed.

Q. The various -- and I'm going to call them text messages, but that may not be right. But the various messages we have reviewed here today, those are all private communications between Mr. Harding and another person, correct?

A. Those are all messages within different applications that

he has used.

Q. And they are communications between him and another specific person, correct?

A. Some of them are posts.

Q. Is there any evidence in this case of him taking action in conjunction with other individuals who frequent 764 sites?

A. While the investigation is still ongoing, we cannot state that he has victimized any one person within the 764 group.

Q. You mentioned within your affidavit Lolita, correct?

A. Correct.

Q. Lolita's a novel by Nikolai Volkov, right?

A. Yes.

Q. And that novel -- by the way, a novel, by definition, is a work of fiction, right?

A. Yes.

Q. And it's in the Library of Congress?

A. I can't confirm that information.

Q. It's likely at Pattee Library at Penn State?

A. Can't confirm that information.

Q. It's likely at Carnegie Library of Pittsburgh?

A. Again, cannot confirm that information.

Q. But it's a book in print and in circulation and has been for over 50 years now, correct?

A. It is a fictional book over 50 years, yes.

Q. It's not currently banned, to your knowledge, in the

United States or in any municipality or township within Allegheny County?

A. I do not know of any bans specifically relating to the book or story, Lolita.

MR. CAPOZZI: Judge, I just need one minute to look for something in the affidavit.

THE COURT: Take your time.

(Pause noted.)

MR. CAPOZZI: If we could go back to I believe it's Exhibit L, Page 5 of 11, please, of the affidavit which would be Page 6 of the PDF.

BY MR. CAPOZZI:

Q. In Paragraph 16, there's a line where you wrote, "made statements in an Instagram group titled 'Hitlers Supreme Henchmen' implying that he would shoot Jewish people." Do you see that?

A. I do see that.

Q. Are you able to tell me in what materials that are before us that there is a specific implication that he would shoot Jewish people? Is there a specific text or post or other communication that there's an implication that he would shoot Jewish people?

A. I just stated one earlier.

Q. Okay. Which was?

A. From the affidavit, the original affidavit if you would

like to go back to that.

Q. Sure. Do you know where it is in the original affidavit?

A. I don't. I didn't memorize the page numbers, but it talks about what I stated prior, "I'll never shoot y'all. You're not Jews," and that's paraphrased.

Q. Thank you.

THE COURT: It's on Page 13 of 37, Exhibit A.

MR. CAPOZZI: Thank you, Judge. I was just getting there.

BY MR. CAPOZZI:

Q. So here, he's communicating -- we're in Paragraph 18, correct?

A. That's correct.

Q. Here, he's communicating with someone. We're not sure who from the affidavit, right?

A. That's correct.

Q. First, he writes, "And no I'd never shoot y'all," right?

A. Yes.

Q. And then he says, "None of y'all are Jews," right?

A. That's correct.

Q. Is that the entire back and forth between these two?

A. I'm not sure.

Q. Is this the entire series of messages that may be related to this particular subject on April 5th of 2024?

A. I don't know.

Q. And what he's saying is he's not going to shoot a specific person, right -- that is the person he is communicating with -- and then he gives a reason, right?

A. Yes.

MR. CAPOZZI: If I could have a second with my client and Mr. Mullen.

THE COURT: Take your time.

MR. CAPOZZI: Maybe more than a second.

THE COURT: Attorney Capozzi, please be aware that if the green light is on, your microphone is on. Put your hand on the pad, and then it'll turn your microphone off so you have some privacy.

MR. CAPOZZI: Thank you.

(Pause noted.)

MR. CAPOZZI: Judge, we don't have anything further at this time. Thank you.

THE COURT: Redirect?

MR. BENGEL: Very briefly, Your Honor.

REDIRECT EXAMINATION

BY MR. BENGEL:

Q. Agent, let me turn you back to the day of the search. Are you aware if a separate device was seized that day from Noah Cron?

A. Yes.

Q. You were asked some questions about the novel "Lolita".

What does that term mean in your world?

A. Sure. So Lolita, as we previously spoke, is a story, and it's about a professor that becomes infatuated with his minor student. And they engage in sexual relations.

Individuals in this world have begun using the term "Lolita" as somebody whether it be a precocious minor female or somebody that is interested in the minor female. So Loli or Lolita, whenever individuals in this world see that, they immediately reference a pedophile.

MR. BENGEL: Nothing further, Judge.

THE COURT: Anything further, Attorney Capozzi?

MR. CAPOZZI: No, thank you.

THE COURT: You may step down, Agent Scott. Thank you.

Attorney Bengel, do you have any other witnesses?

MR. BENGEL: No, Your Honor. Thank you.

THE COURT: Attorney Capozzi, do you have any witnesses?

MR. CAPOZZI: Judge, I do. It's really -- it's not necessarily with respect to the preliminary examination but with respect to detention.

Would you like to hear from that witness now?

THE COURT: Who is it?

MR. CAPOZZI: It's going to be Mr. Harding's mother.

THE COURT: Can I have Counsel approach?

(A sealed sidebar occurs.)

THE COURT: Counsel, we're going to take a brief adjournment, give them an opportunity to have consultation with Mr. Harding's mother.

(A recess was taken.)

THE COURT: Thank you, everyone. Please be seated.

Attorney Capozzi, are you ready to proceed?

MR. CAPOZZI: Yes, I am. Sorry, Judge.

THE COURT: Do you have any witnesses?

MR. CAPOZZI: Judge, I'm going to proffer, if I may.

THE COURT: You may.

MR. CAPOZZI: Judge, Mr. Harding is here today with his mother and her spouse -- and they are seated on your right in the first pew in the first two spots -- and also his father and his spouse who are also in that first pew on your right, second two spots.

He's 20 years old. He's 5'8", 140 pounds. You had an opportunity to observe him. He is a small build. He is a graduate of Quaker Valley High School, graduated on time.

After a difficult time in Peters Township, some of which you heard about today, he enrolled at Quaker Valley and, after an adjustment period, turned in a strong academic performance earning a grade point average in Grade 12 of 3.91.

After high school, he was part owner of a jewelry store for a period of time. When that failed, he started

working as a laborer for his mother and stepmother on their farm in Sewickley Township.

He attends therapy right here at the AHN Center For Traumatic Stress. I spoke with Dr. Barriga, B-A-R-R-I-G-A, who reported to Mr. Mullen and me that, upon release, Mr. Harding would be welcomed to return to his and Dr. Colby Lea's care, L-E-A.

He's never failed to appear for a court hearing or violated a condition of supervision. He does not possess a passport. He's never traveled abroad. He does not speak a foreign language, does not have family abroad. He has no history of using or possessing a fake ID.

He is, unfortunately, as you know not without criminal history. On 8/27/19, he was arrested and ultimately adjudicated delinquent on the offense of terroristic threats in violation of 18 Pa. CS 2706. As the Court has noted, it is a misdemeanor of the first degree.

It is my understanding this stemmed, at least in part, from a journal he was keeping. His therapist at the time recommended he might keep a journal so he could express his feelings of anger and bullying that he was going through.

I think that you have heard testimony about an incident on a bus where he was accused of assaulting someone. What you didn't hear -- or threatening someone. What you didn't hear was that threat was in response to an assault on

him where he had been punched in the stomach and pushed in on.

On 9/27/24, more than five years later or about that time, he was arrested for disorderly conduct and criminal mischief in South Park Township. It's my understanding this stemmed from a spray-painting spree in South Park Township where he and another person were tacking racist and anti-Semitic symbols. It resulted ultimately as I will show you to a disorderly conduct.

Judge, the search warrant was executed, and the next three arrests all stem from -- that ultimately stemmed from that search warrant. He's charged with possession of a controlled substance in violation of (a)(16) which is an ungraded misdemeanor. That's in violation of the Pennsylvania Controlled Substance Act, Subsection 780-113 (a)(16) and also (a)(32), possession of paraphernalia.

It's my understanding that paraphernalia was used to ingest marijuana. He has a pending charge in the Court of Common Pleas for false statements in connection with the purchase of the firearm.

And then, Judge, he had a 6106 charge in violation of the Title 18 of the Pennsylvania code, but that charge was dismissed because the weapon at issue was a long gun.

Fortunately, Judge, we know from his criminal history, as I noted above, he has never failed to appear before, and he has not committed a new offense while on

supervision.

THE COURT: Can I ask you a question about that? I'm sorry to interject.

MR. CAPOZZI: Yes.

THE COURT: I see offense date of possession and paraphernalia on December 11th.

MR. CAPOZZI: Judge, that's an offense date because that's the date of the search warrant. He was arrested for it on the 16th.

THE COURT: So it's not -- the later charge is not a violation of bond?

MR. CAPOZZI: That's correct, Judge.

THE COURT: Understood. Proceed.

MR. CAPOZZI: Fortunately, we know from this that he's never failed to appear for court and not committed another new offense while on supervision and complied with Court-ordered obligations, whether as a juvenile or as an adult.

You'll see, Judge, on the disorderly conduct that it was paid. His mother, Tabitha, paid it. He is not currently on probation or parole, and, Judge, this to your point is that this offense -- to be clear, this offense which occurred on or before December 11th predates the pending charges against him and the charge which was recently dismissed and on which no complaint frankly -- well, that's argument.

Judge, he's never been arrested for or committed a crime. Excuse me, he's never been arrested or convicted for a crime of criminal violence. He is, as noted above, part of a family that is committed to him and of which he is very much a part. I'll hand up some photographs of him, and you can go through them.

He's never been violent or abusive toward his mom or his dad, his siblings, his animals, or his parents' animals. Mom and dad and both stepmoms were at his prior court hearing, and as I pointed out to you, they're here today. And mom and dad speak with him almost daily.

He has access to and voluntarily participates in health care. He has in the past used marijuana, but he told the probation office as I understand it, Judge, he has not used any in the month since the search warrant was executed that underlies this case.

Judge, the firearms that he possessed as the special agent indicated -- it is special agent, right?

THE WITNESS: That is correct.

MR. CAPOZZI: Three were antique. A number were long guns. A number were handguns, but, Judge, none of them had been converted to fully automatic, not a single one.

Judge, I've previously provided the exhibits that I'm going to walk you through to the United States Attorney.

May I pass them up?

THE COURT: Please.

Attorney Bengel, you have a copy of these?

MR. BENGEL: I do.

THE COURT: Do you have any objection to me looking at them?

MR. BENGEL: No.

MR. CAPOZZI: Judge, as I understand it, there may have not been any handguns found, but that's not what the testimony was.

Judge, let me start with Exhibit B which is the last two pages because that concerns the disorderly conduct -- the criminal mischief case that was ultimately resolved to disorderly conduct in South Park Township. I offer that to you so that you can see it was resolved as a non-traffic case. A fine was imposed and costs, and that was paid.

And then, Judge, these are all photographs that were taken within the past year. Page 1 of Exhibit A is a picture of Aidan at his mom's home and his stepmom's home, and I believe that's on Christmas day. Unfortunately, a bit of it got cropped out, Judge, but it's a model that he's opening up.

And then, Judge, Page 2 of Exhibit A -- unfortunately, that was cropped out -- was actually him holding his Quaker Valley High School diploma.

Page 3 of Exhibit A is him with his sister and his niece.

Page 4 of Exhibit A is him with his ex-girlfriend.

Page 5 of Exhibit A is another picture of him with his niece.

Page 6 of Exhibit A is a picture of him I believe with his cousins.

Page 7 of Exhibit A, another one of him with one of his cousins.

Page 8 of Exhibit A is a picture of him and one of his cousins with a couple of dogs, and then, there's a picture of him with his girlfriend; his mother, Tabitha; his stepmother, Tamara; and I believe his grandmother.

Judge, I show you those because it demonstrates that there's another side to this young man than what you heard from the Government today. He is part of a family that is committed to him and that he is close to.

Finally, Judge, I would proffer to the Court Tabitha Latshaw, who is his mother, as a third-party custodian. She is a paramedic, and, Judge, I have a third-party custodian questionnaire which she completed and signed. I'm going to hand it up to the Court and ask that it be marked for purposes of the record as Exhibit C.

I would tell you, Judge, since this is an exhibit and I'm offering it -- it does have an address and a telephone number in it. I'd ask for the opportunity to redact it and return it to the Court later today.

THE COURT: So the exhibits in hearings like this don't get docketed. They're kept in chambers. You're safe.

MR. CAPOZZI: Thank you.

THE COURT: Do you move for the admission?

MR. CAPOZZI: Of A, B, and C.

THE COURT: Any objection?

MR. BENGEL: No, Your Honor.

THE COURT: They are admitted.

MR. CAPOZZI: Thank you, Judge.

THE COURT: Is that the end of your proffer?

MR. CAPOZZI: That is the end of my proffer.

THE COURT: I do have a question for you. You were talking about the pending charges. I do see on the bond report, not that it affects our ability to move forward with the hearing, but it does say bail denied Allegheny County.

Is that still the case?

MR. CAPOZZI: It is not, Judge.

THE COURT: So bail's been --

MR. CAPOZZI: The bail was initially denied on the VUFA charge, 6106, which was the possession of a firearm. That charge has been dismissed. It would allow him to be released.

THE COURT: But it says bail denied, and it's related to the false statements in the purchase of firearm.

MR. CAPOZZI: My understanding, Judge, is bail has

been set, but I'm going to ask Mr. Mullen to confirm that while we're handling his proffer.

MR. MULLEN: That is my understanding, too, but I will pull a docket from Allegheny County, Your Honor, and confirm the status of bail.

THE COURT: Sorry, Attorney Mullen. I didn't mean to cut you off.

Do you have a position on that, Attorney Bengel, if bail was denied in Allegheny County?

MR. BENGEL: Your Honor, I think it was initially, but I think the way that Mr. Harding came into federal custody was that he was being held on that county charge. He was granted bail on that charge and fell to the federal arrest warrant, and that's how he came here.

THE COURT: So he's not here by writ?

MR. BENGEL: No.

THE COURT: That clarifies that. Thank you, gentlemen. I'm not sure who's microphone is popping, but somebody is popping right now.

Attorney Bengel, are you prepared to make a proffer as well?

MR. BENGEL: Yes, Your Honor. I've shared these materials with defense, but your binder, Your Honor, should include an Exhibit AA and an Exhibit BB.

AA is a photo of a document that was recovered from a

search. It is an email to Aidan Andrew Harding dated August 13, 2019. I won't read it for the record. I think it may be easier for the Court to review it.

THE COURT: Can you give me one minute, please?

MR. BENGEL: Absolutely.

(Pause noted.)

THE COURT: I've read it.

MR. BENGEL: So, Your Honor, I would move for admission of Government's Exhibit AA and ask to be able to refer to it during argument.

THE COURT: Sure.

MR. CAPOZZI: No objection.

THE COURT: It's admitted.

MR. BENGEL: I'd also move for the admission of Exhibit BB which I intended to use for cross-examination if Aidan Harding's mother, Ms. Latshaw, had testified. BB is 25 pages of text messages between Ms. Latshaw and the Defendant spanning November of 2024 to December 8th of '24 -- 2024, excuse me. I would also request that the Court review these and I be permitted to make reference to them during argument.

I think they show, among other things, that Ms. Latshaw was aware that her son was a Nazi, was part of groups that protested an Anne Frank play, that Aidan Harding, while nominally was working for his mother, was frequently

absent from work but that she paid him anyway.

Again, more text messages indicating her knowledge that he was a Nazi, text messages indicating that she was aware of him having police contact.

THE COURT: So, Attorney Bengel, you have made that proffer. Before I go through each bubble, do you want to move for the admission of this and then perhaps point me to bubbles that you want me to pay attention to, or do you want me to read the 25 pages now?

MR. BENGEL: I think Your Honor could read them relatively quickly.

THE COURT: All right. Give me a minute to read these pages.

Are you going to have any objection to the admission of this?

MR. CAPOZZI: No.

THE COURT: So Exhibit BB is going to be admitted. I'm going to take a few minutes.

(Pause noted.)

THE COURT: I've read everything. Thank you.

MR. BENGEL: Thank you.

THE COURT: Proceed.

MR. BENGEL: Your Honor, now that the Court has received and reviewed those exhibits, all that's left for the Government is argument.

THE COURT: You want to argue?

MR. BENGEL: If this is the appropriate time.

THE COURT: It is.

MR. BENGEL: Your Honor, as the Court set out at the beginning of the hearing, we're here for both a preliminary hearing and a detention hearing. So I'll start with the preliminary hearing.

We're here for the complaint sworn by Special Agent Lauren Scott alleging possession of child sexual abuse material, and Your Honor determined at the time of being presented with that affidavit that there was probable cause to believe that Mr. Harding had committed the crime charged in the complaint.

I don't think anything that's happened here today has undermined that conclusion which doesn't rest just on the description of the two CSAM videos by Agent Scott, but as corroborated by the Defendant's searches for Daisy's Destruction, the Defendant's interest and possession of 764 material, which Your Honor knows is a movement that victimizes children and minors, as well as the materials that the agent addressed in summary form concerning materials that may not be strictly child sexual abuse material but abuse materials. They're materials in which young children, toddlers, are being harmed, hurt, abused.

I think all of that goes to support the Court's

probable cause finding which has already been made at the time of being presented the affidavit that the charged crime has been committed in this case. The weight of the evidence is strong, and the nature of the offense is serious. It's a crime of violence under federal law.

That brings us, Your Honor, to the detention issue, and just to address the legal framework at the outset, the Defendant is charged with possession of child sexual abuse material, and my understanding is that this is not a presumption case. I think that the statute, the Bail Reform Act, Section 3142, I think when it addresses the crimes against children, that triggers a presumption. I think it omits 2252(a)(4). That being said, we believe we have carried our burden in this case and that detention is absolutely necessary even if it is not a presumption case.

The question is whether somebody facing the charges that the Defendant is facing can be released given his documented history and characteristics.

Here are some of the characteristics that the Court has heard about today that I think are extremely important.

First, the Defendant adheres to not just one but several different interrelated ideologies that justify the use of violence, the Nazi ideology. The reference to Elliot Rodgers connects him to an incel ideology. There is the admiration for so many different mass shooters, but the

fixation with the Columbine shooters who the Defendant's admiration for those two people who murdered 13 students at Columbine High School in 1999 is durable. We're going on at least five years of strict adherence to admiration for those two people.

And this is not an interest in violence in the abstract. This is an interest in violence in the particular. The Defendant has videos of several different mass shootings in which many, many people were killed, the Nairobi attack, a school shooting in Nashville, a mass shooting at the Tops in Buffalo, Columbine video, not to mention more than 50 beheadings, rapes, and torture videos. That is the comfort with violence in the particular that is incredibly relevant under the Bail Reform Act.

There's also the 764 content, the searches for Daisy's Destruction, and then the associated audio which the agent testified includes very horrible things, and then, what is the Court to make of the video in which the Defendant is mocking the father of a girl killed at Columbine who appears to have presented at his school. It all amounts to real disregard for human life, Your Honor.

We're fortunate that the ideology that the Defendant has adhered to has not yet led to a mass casualty attack, but it has led to action. The Court has heard about waving Nazi flags, spray paint, what the Defendant calls activism, and he

has continued to engage in that conduct undeterred by police contact.

There's the juvenile adjudication, that's 2019, the arrest for spray-painting, the contact with Pittsburgh Bureau of Police on the Liberty Bridge, the FBI search of his home. After that, what happens? FBI drafts a search warrant affidavit that talks about the Defendant's statements about using a Daniel Defense rifle to commit a high-kill count attack.

On December 11th, 2024, FBI seizes a Daniel Defense rifle and then learns not 30 days later the Defendant has gone out but not just got more guns but a Daniel Defense rifle. Defendant's access to firearms of which there were 22 in that house on the day of the search, including the three antique guns, underscores another point which is that, if released, he would have access to means of evading court supervision.

He has correspondence on Telegram, and the Court has heard a lot about the individual, Noah Cron, who is not in custody, and I think this Court can infer from the pole cam videos remains connected to the person who would be Defendant's third-party custodian. We watched a firearm walk out of that house with Noah Cron. I don't feel comfortable that I know where that is. I don't feel comfortable that the Defendant would not have access to it if released.

There's overwhelming evidence of dangerousness in

this case, Your Honor, and while you didn't hear evidence today about specific named individuals, here are some categories of people that the Defendant poses a danger to, children. He possessed child sexual abuse material and material involving violence against children. He has an obvious documented durable hate toward Jewish people. You hear him using the N word. He has chats about Elliot Rodgers, the incel killer. You also heard in Exhibit U, I think the Government's last exhibit, him acting out this mock shooting of a popular girl.

I think we need to be concerned about the danger that the Defendant poses to women, the general public, anywhere that one of the mass shootings that he's so enamored with might occur and pretrial services, anyone asked to supervise the Defendant.

I think it's important that when FBI executed the search warrant, they did so with a SWAT team. Pretrial services doesn't have that capacity. We would be asking somebody from probation to supervise the Defendant in this case. I think that's incredibly risky.

There's also evidence in this case that the Defendant is a danger to himself. There is no alternative to detention in this case, Your Honor.

The Defendant proffered the testimony of his mother, Ms. Latshaw. I don't think that that should give the Court

any comfort at all. The text messages at Exhibit BB indicate that Ms. Latshaw was aware of what her son was doing, and she must have been aware of that all the way back to 2019.

And that means that one of two things are true, possibly both: One is that she minimized the danger that this behavior caused to the public, or she didn't like the behavior but was unable to stop it because the Defendant is an adult. He's his own person. He has his own thoughts and takes his own actions. That should give the Court great pause about entrusting the Defendant to her care in this case. It looks from the text messages like the Defendant was not consistently attending that job but was being supported anyway.

The release plan is clearly inadequate even with home detention. Does Ms. Latshaw work during the day? Is she going to be leaving the Defendant alone? If a gun shows up in the house, what is she going to do? If he says he's going to go out and do activism, is she really going to stop him? And if the Defendant forms an intention to do something very horrible, location monitoring would only help prove the case afterward. It would do nothing at all to deter it now that a person who holds these ideologies to justify violence have been possibly aggravated by the existence of this federal case.

I don't think it's comforting that the Defendant could remain in therapy. The Court sees from Exhibit AA that

therapy in some form has been going on since 2019, and we're still here.

In the Bail Reform Act, the question is whether there are conditions that could reasonably assure safety of the public and the appearance of the Defendant. In thinking about reasonableness where there are greater risks, greater precautions are necessary. The risk here is very, very high. It's difficult to imagine a case that poses a greater risk. This is an opportunity to mitigate that risk, and the only way to do it is by an order of detention pending trial, Your Honor. That's the Government's request.

THE COURT: Thank you.

Attorney Capozzi?

MR. CAPOZZI: Judge, thank you for you and your staff for your time. This may be my record for a detention and a preliminary examination. Judge, being a Nazi is not unlawful. Having an interest in crime, even heinous crime, in and of itself is not unlawful. And to some degree, what the Government is asking you to do is to detain Mr. Harding because of his thoughts, his speech and his associations, all of which is protected.

But let's first talk about the CSAM offense, Judge. There is probable cause of possession of CSAM in this case. What's missing from the Government's presentation, Judge, particularly as it relates to detention, is when was that CSAM

screenshot? When was that CSAM downloaded?

And, Judge, I find -- I'm not just surprised. I'm shocked that we're here, you know, more than two months after a search warrant was executed and a device was seized and those questions can't be answered, and a witness with the answer to those questions wasn't brought before you.

The other thing we don't know, Judge, at least with respect to the images that we saw today, is whether they're computer generated or they're actual images. At least with respect to -- there's two images, I think it's N and O, we can't say they are children.

Now, let's talk about when the FBI Joint Terrorism Task Force learned about Mr. Harding at least recently, October 15th of 2024, 57 days later before they executed a search warrant. They had all this information directly to the Pittsburgh office on October 15th of 2024, and it took them 57 days to take any action whatsoever.

Now, let's talk about the fact that there's an allegation, and, Judge, I submit to you it's an allegation without evidentiary support that Mr. Harding's interest in 764, in the national socialist party in these sorts of things go back to 2019. And I started to go through the affidavit and stopped I think after about ten paragraphs because the earliest time that we have any reference to something in that line, not necessarily school shootings, Judge, but that line

is April 5th of 2024.

So, let's get to his mom for a minute, Judge. You have the third-party custodian affidavit, and I submit to you that many of the questions that Mr. Bengel has raised are answered within that affidavit. And you have a commitment, if he would violate a condition of bond, she would promptly reach out to probation and pretrial services.

You have a statement from her that there aren't any firearms on the premises. We get to her communications with her son and, in particular, let's start with Exhibit AA. Judge, I look at that and I read it and I see it as an email of a mom who loves her son very much who is letting him know that his conduct is not okay, that these are not things he should do, that these are not things to joke about. It was going to be necessary to talk about at family therapy, ton.

I told you before he had a committed family. He has a committed family. These issues are difficult to work through, and things don't happen overnight.

Then when you go through the text messages, one of the things that struck me is that at one point, she writes to him, "be a Nazi, don't be a drunk. Get up and come to work." He denies being hung over. He denies being drunk. It doesn't really matter, Judge, but he starts criticizing the Freemasons, and her response is, "No my uncle Andrew was high up in the Masons."

And then, she texts him on December 7th of 2024, can't you two just go out and be normal?  In other words, stop this nonsense.  She's being a parent of a young adult.  She has not abandoned her responsibilities.  She's doing what she said and more importantly, on Page 22, she wrote, people in this country overwhelmingly don't want what you want, so what is the point?

Page 23, I get that you need a purpose.  I just don't know why humans can't mix with other humans.  The human race is not going to die out.

Also on Page 23, I guess I just wish your life's purpose didn't have to do with hating anyone else or violence or whatever.  I don't mean to call you violent, I'm afraid you're going to get in hurt or in trouble.  Just be careful.

Then he writes, Judge, "I will be careful.  I promise, and I won't do anything illegal."

That leads me to a really important point here.  He had a plan in 2019.  It was all in the past tense.  This is not a young man who was thinking, I'm going to put this in the past sense so five or six years from now when I'm confronted with it in a federal courtroom, I can have a lawyer argue it was in the past tense.  It's because it was in the past tense, Judge, and nothing has happened in the last five years.  And he's had access to these firearms probably for some period of time at this point.

I appreciate Mr. Bengel's candor on the presumption issue, Judge, and I apparently mis-assessed that issue, so I will ask for your permission. Judge, there are two ways you can detain him -- I guess three. He could be a flight risk or he could be a danger or both. There's no risk of flight in this case, zero. He has nowhere else to go and he doesn't really have the means to flee. And if he were to go somewhere, I don't think he could survive very long on his own.

I would submit to you that he is simply not a flight risk. Then the question becomes dangerousness, and much of the dangerousness evidence relates to his thoughts, his words, and his associations. And that should not be enough to detain him, Judge.

You have the offense that's charged, Judge, and it's a possession offense. It's not a production or dissemination offense. There's no violence that's charged. There's no attempted violence. There's no threat. There's no attempted threats. I note CSAM is a violent crime under federal law, but this particular crime doesn't involve him applying violence to another person.

I understand the argument, Judge. I don't necessarily agree with it. Then you got to look at the actual videos and images that we're talking about, one of which is two seconds, another of which is three seconds and several

additional images of child sexual abuse materials, at least one of which is an animation. Judge, it's still a crime, but as I pointed out before, we don't know when he or whoever was downloading them obtained them.

Judge, there is not clear and convincing evidence that the Defendant is a danger to the community and should be incarcerated pending trial. The Government has not alleged or offered evidence of an articulable threat to a specific person or even a specific group of people within the community. Does he have some thoughts, an ideology that is offensive? As his own mother said, it is not what the overwhelming majority of the people in this country want. That's who we're proposing he stay with, Judge.

Additionally, we believe there's a condition or combination of conditions that can assure his appearance and safety to the community. Judge, that is, one, that his mother be appointed a third-party custodian with a full understanding of her responsibilities. Two, if he is to be released, he has to reside at her place. Three, all of the standard conditions around no guns, no other dangerous weapon, get up and go to work. We can put location monitoring on him to ensure he doesn't leave that place. Judge, I don't think it is just subsequent evidence. I think it is a daily reminder to an individual that you have an obligation, in addition to the obligation that everybody else has now, to not violate the

law. I think that's the point of it.

Judge, his mom is willing to restrict access to the Internet if the Court believes that is appropriate. She will help him get to and from therapy and, Judge, therapy is a process. And it takes time, and if he's sitting in the Butler County Prison or somewhere else, he's not going to be getting any better during this period of time. I would submit to you that there is more than some evidence. There's ample evidence to allow the Defendant to be released, and the evidence of his danger to the community is more speculative than it is convincing. Thank you.

THE COURT: Thank you.

Attorney Bengel, do you have any response? I'm not inviting them. I'm just asking.

MR. BENGEL: Your Honor, I would direct the Court to -- into the Instagram messages that Mr. Capozzi walked the witness through about how the Defendant had a plan. I would just like to remind the Court of the message where the Defendant says, "I'm going to be a good boy for the police so that way I can keep my record straight and then get guns and leave my mark on the world. I was going to do it when I'm 19 or 21." He's 21 now.

Since Ms. Latshaw did not testify, I did not have the opportunity to ask her these questions. Had she testified, I would have asked her, "After your son learned of the federal

investigation, did he ask you about leaving the country?

THE COURT: Is that everything?

MR. CAPOZZI: The only thing I would point out to you is one text message on Page 21 of 37 of Exhibit A. It's the third block. "Okay, my concern isn't getting stopped at the range I'm more worried about if for whatever reason the police seen I had that trigger, would there be legal ramifications or can I prove somehow it's grandfathered."

Judge, he's worried about not being in violation of the law. That's what that series of text messages is about. Sometimes, Judge, you know, you got a big dog or maybe a small dog that's a lot of bark but no bite. I think that's what you have here today.

THE COURT: Thank you. Gentlemen, I want to commend you on your work today. It's not often the Court has such well presentations by both Counsel. I think the presentations by both were excellent. I know how hard it is to get presentations done on short notice, to be ready to present your case to the Court. I feel like I have a sufficient amount of information to make my decision.

To the family that's here, thank you for coming. It's often that, as a Judge, you sit here and the person who is accused is alone, and they're in a very difficult predicament. Without family support, people can't get through this. So your presence here today is important, and I thank

you for being here.  I know this hasn't been easy, I'm sure, to hear.

So with that being said, in every detention hearing, I note these matters are the most difficult decisions that I have to make.  The decision-making process begins with the backdrop that our United States Supreme Court has held, that in society, liberty's the norm, and detention prior to trial is a carefully limited exception.

I also begin with the recognition that the cases that come before this Court in federal court are often serious -- this is certainly one of them -- and that carefully limited exception is often found by the Court, and detention is ordered in many cases.

What guides the Court is the evidence presented, the arguments of Counsel, obviously lots of exhibits, the pretrial report, and the factors set forth in the Bail Reform Act. Ultimately, family, so you understand, the decision is essentially two things:  Is there a condition or a combination of conditions that would assure the safety of the public; alternatively and in combination of that, are there conditions or a combination of conditions that would assure Aidan Harding's appearance at future proceedings?

These are the factors I have to consider, the nature and circumstances of the alleged offense.  In this instance, Mr. Harding is charged in violation of Title 18 United States

Code, Section 2252(a)(4)(B) and (b)(2), possession and attempted possession of material involving the sexual exploitation of a minor. You know, the evidence that you have certainly is sufficient to find probable cause, and probable cause is found.

What was presented today is simply two videos testified to as depicting minors engaged in sexual activity, and those videos were located on an iPad and separately one video on an iPhone, both apparently items that belonged to Mr. Harding. And that's sufficient at this stage -- not trial, this is a preliminary hearing -- to find that this evidence exists.

As to detention, again, this is an offense that involves sexual exploitation, and it's something the Court takes seriously. I note often, in possession cases, that the Government agrees to bond, but the Government has not agreed to release in this instance.

I've considered the weight of the evidence in this case. While the Courts have held this is the least important factor because of the presumption of innocence, I note the weight of the evidence appears to be strong. I consider the history and characteristics of Mr. Harding. The bulk of my decision is based on this.

It's evident that you're a lifelong resident of Western Pennsylvania. It's evident that you have a mom and a

dad and sister who live here. It's evident to me that you have sufficient ties to this community without a passport, without U.S. travel, that you are not, in my view, a flight risk. You have family that are here, and I thank them for coming.

One of the characteristics, though, that we have to consider in your history and characteristics and one of the things your attorney objected to so you know and that I permitted in -- and you may have questioned why I did that -- is something called past conduct. So past conduct is everything before today, and even though you haven't been accused of certain things, there is lots of evidence of you apparently living two separate lives. And that entails 764 involvement and the patriot front involvement and the spreading of anti-Semitic paraphernalia, interest in mass shootings, interest in murder, threats of being another shooter.

And I'll concede, as your Counsel has noted, that there's nothing specific. You did not identify a school. You did not identify an individual, but I disagree in the sense that there are groups that are apparently of interest to you and of target based on your words which would include Jews, people that are minors, and also perhaps -- although the photograph of you with your prom date suggests otherwise -- people of a different color than you.

I do have to note that the 22 firearms, including the AR-15 Daniel Defense rifle, and the efforts to get a new one after the FBI seized the Daniel Defense rifle is concerning, as are the content of your communications online which I agree with Counsel, there's oftentimes when people have a bigger bark online than they do in person.

But then to visit a site such as Columbine, videotape conduct that was, to put it lightly, troubling, urinating on a shirt which was particularly troubling. You may have felt anonymous about those acts, but this wasn't one instance from 2019 getting charged with a terroristic threat until now. This is many, many, many instances of statements that are threatening, concerning, troubling, and then to add into the plate images of mutilation, videos of necrophilia, videos of murder, having guns with serial killer names on the stock and the scope of the conduct is astounding.

I acknowledge that you have some work history. I acknowledge that you're in good health, and I acknowledge that you have had what seems to be a pretty involved history of mental health, my guess is by your parents trying to get you involved in treatment and getting you medication, but here we are.

I've considered the proposed release plan, and I've considered the probation office's recommendation which does recommend detention. And I don't think I need to go any

further.  I find, by clear and convincing evidence, that no combination of condition will reasonably ensure the safety of others and, therefore, I order you to be detained, and I commit you to the custody of the United States marshals pending further proceedings.

Is there anything further?

MR. BENGEL:  Nothing, Your Honor.  Thank you.

MR. CAPOZZI:  There is not.  Thank you, Judge.

THE COURT:  Thank you, everyone.  We are adjourned.

(Whereupon, the proceedings were adjourned at 2:12 p.m.)

C E R T I F I C A T E

I, AIMEE P. MARTIN, RMR, CRR, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled case.


_\s\ Aimee P. Martin___          17th day of April, 2025
Aimee P. Martin, RMR, CRR        Date of Certification
Official Court Reporter