IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA

v.

AIDAN HARDING

Criminal No. 25-44

## OMNIBUS RESPONSE TO DEFENDANT'S PRETRIAL MOTIONS

AND NOW comes the United States, through its attorneys Troy Rivetti, Acting United States Attorney for the Western District of Pennsylvania, and Jeffrey R. Bengel, Assistant United States Attorney for said district, and respectfully submits this omnibus response to defendant Aidan Harding's pretrial motions.

## INTRODUCTION

On December 11, 2024, agents of the Federal Bureau of Investigation and Joint Terrorism Task Force executed a search warrant at the residence of the defendant, Aidan Harding. The warrant authorized agents to search for and seize evidence relating to possible violations of Title 18, United States Code, Section 875(c), which prohibits the transmission in interstate commerce of "any threat to injure the person of another."

In the supporting affidavit, the government summarized evidence that Harding, among other things: had been adjudicated delinquent for Terroristic Threats in 2019, for conduct related to a threatened school shooting; was a member of Patriot Front, a racially motivated extremist group whose members had previously committed acts of violence in furtherance of their ideology; had intentionally targeted Pittsburgh's Jewish community with swastika flags and antisemitic fliers; had visited the site of Columbine High School, where two students murdered thirteen people in 1999; possessed a Daniel Defense rifle, which he had previously indicated he would like to use in a "high kill count" attack; had equipped that rifle with a forced-reset trigger that allowed for

1

more rapid firing; and possessed more than twenty additional firearms, which he sometimes practiced shooting. The affidavit also cited social media communications in which Harding expressed admiration for Robert Bowers, who murdered eleven people at the Tree of Life Synagogue in 2018, and two other white nationalist mass shooters; implied that he would like to "shoot Jews"; and described himself as a "next shooter."

When they executed the warrant, which had been signed by United States Magistrate Judge Maureen P. Kelly, agents located and seized evidence related to their threats investigation. Those items included more than twenty firearms, including both the Daniel Defense rifle and a separate long gun that had been marked with the name of serial killer Richard Ramirez. They also found knives, significant amounts of Nazi and other propaganda, and handmade drawings of the Columbine shooters. On two of the electronic devices that were searched pursuant to the warrant, agents located dozens of videos depicting gore and graphic violence, including against toddlers and children. They also identified evidence connected to the 764 movement, a network of racially motivated extremists who seek the downfall of civilization through the violent, sexual corruption of minors. Finally, Harding's devices contained child sexual abuse material, which was seized pursuant to subsequent search warrants. Based on the possession of those and other materials, Harding was charged by complaint and then indictment with a violation of Title 18, United States Code, Sections 2252(a)(4) and 2252(b)(2). Following a lengthy detention hearing, United States Magistrate Judge Christopher B. Brown ordered that Harding be detained pending trial to ensure the safety of the community. *See* Detention Hearing Transcript (Doc. No. 44).

Now, Harding seeks to suppress all evidence seized from his home, arguing that the government's search warrant affidavit was lacking in probable cause. *See* Mot. to Suppress (Doc. No. 49). Harding is not entitled to that relief, and his motion should be denied. The search

warrant affidavit provided United States Magistrate Judge Maureen P. Kelly with a substantial

basis for concluding that probable cause existed. Even if it did not, suppression is not appropriate

where, as here, the government relied on the warrant in good faith while attempting to mitigate a

serious threat to public safety. Finally, for the reasons below, Harding's separate motion for

discovery should also be denied. *See* Mot. for Discovery (Doc. No. 48).

<b><u>ARGUMENT</u></b>

**I.      The Search Warrant Was Legally Sufficient and Evidence Recovered During the Search is Admissible**

**A.      There Was a Substantial Basis for Judge Kelly's Probable Cause Finding, so Harding's Motion to Suppress Must be Denied**

"The Supreme Court has clearly indicated that the conclusions of a neutral magistrate

regarding probable cause are entitled to a great deal of deference by a reviewing court, and the

temptation to second-guess those conclusions should be avoided." *United States v. Ritter*, 416

F.3d 256, 264 (3d Cir. 2005) (citing *Illinois v. Gates*, 462 U.S. 213, 236 (1983)). When reviewing

a magistrate judge's probable cause determination, the "role of a reviewing court is not to decide

probable cause *de novo*, but to determine whether 'the magistrate had a substantial basis for

concluding that probable cause existed.'" *United States v. Stearn*, 597 F.3d 540, 554 (quoting

*Gates*, 462 U.S. at 238). "If a substantial basis exists to support the magistrate's probable cause

finding, [a reviewing court] must uphold that finding even if a different magistrate judge might

have found the affidavit insufficient to support a warrant." *Id.* (internal quotation marks omitted).

Probable cause exists where "there is a fair probability that contraband or evidence of a crime will

be found in a particular place." *Gates*, 462 U.S. at 238. As described by the Supreme Court, it

is a "fluid concept" that is concerned with "the factual and practical considerations of everyday

3

life on which reasonable and prudent men, not legal technicians, act." *Id.* at 231–32 (internal quotation marks omitted).

The search warrant signed by United States Magistrate Judge Kelly authorized the agents to search Harding's residence for evidence related to possible violations of 18 U.S.C. § 875(c), which prohibits the transmission in interstate commerce of "any communication" containing "any threat to injure the person of another." To establish a violation of 18 U.S.C. § 875(c), the government must prove that "the defendant transmitted a communication for the purpose of issuing a threat or with knowledge that the communication would be viewed as a threat." *United States v. Elonis*, 841 F.3d 589, 596 (3d Cir. 2016). The communication must also be one that "a reasonable person would view as a threat." *Id.* When conducting that inquiry, the factfinder must "consider the context and circumstances in which a communication was made to determine whether a reasonable person would consider the communication to be a serious expression of an intent to inflict bodily injury on an individual." *Id.* at 597.

As part of that analysis, one may consider "what [is known] about the speaker." *United States v. Hussaini*, 2022 WL 138474, at *8 (S.D. Fla. Jan. 14, 2022). Here, the speaker is Aidan Harding—an individual previously adjudicated delinquent for Terroristic Threats after communicating on Instagram about his plans to conduct a school shooting. *See* Exhibit A ¶¶ 43–48. The evidence developed in that case involved social media communications, set forth in the Affidavit, which are also worth quoting here at length:

> I would use an ar15 probably a Daniel defense and a glock 19 handgun and a moss berg 14 inch barrel shockwave . . . Shot gun . . . I had an awesome plan I would have either gon in guns blazing which would be hella easy and high kill count or go in with bombs which probably won't work and it will probably get me killed . . . So I was just gonna go in guns blazing . . . But I was gonna do it when I'm like 19 or 21 . . . But I'm gonna be a good boy for the police so that way I can keep my record straight and then get

> guns and leave my mark on the world . . . Teach people that they need to stop bulling . . . People always say oh violence doesn't solve anything but when I put a bullet in all the bad peoples heads then there will be no bad in the world . . . [The Columbine shooters] were kickstarting a revolution . . . And I am basically a prophet or an apprentice to finish what the gods started.

*Id.* ¶ 44. These communications reveal Harding's admiration for mass murderers, including the Columbine shooters; his own interest in committing a mass shooting; and his preferred weapon, a Daniel Defense rifle. Transmitted over the internet, they would have traveled in interstate commerce. And, because they resulted in a criminal conviction, they would have alerted Harding to the way such threats are reasonably perceived by others. For all of those reasons, these messages are important context that must be considered when assessing Harding's words and actions in 2024—by which time he had turned twenty and reached the age at which he planned to "leave [his] mark on the world."

The Affidavit describes multiple instances of threatening speech by Harding—at least some of which was transmitted in interstate commerce. In an Instagram group called "Hitlers Supreme Henchmen," Harding commented that he would never "shoot ya'll" because "[n]one of ya'll are Jews." *See* Exhibit A ¶ 18. The implication that Harding would like to shoot Jewish people is obvious to any reader of this comment. Similarly, while communicating over Instagram with the user "sign8ofevil," Harding explained that he "spread flyers naming the Jew and what they've done . . . I even go into Jew neighborhoods and fly swastika flags and put out antisemitic flyers." *Id.* at ¶ 19. Like cross-burning with the intent to intimidate, targeting Jews in a Jewish neighborhood with swastika flags could be a "constitutionally prescribable" threat. *See Virginia v. Black*, 538 U.S. 343, 365 (2003). And, to take one final example, Harding informed an individual over the messaging application Threema that he was a "next shooter" and member of the Patriot Front. *See* Exhibit A ¶ 42.

Harding would have known that these communications were threatening. By the time Harding made his comments about being a "next shooter" and implying that he would shoot Jews, he had already been adjudicated delinquent for Terroristic Threats based on similar conduct. The fact that Harding repeatedly engaged in threatening conduct supports a finding that he was acting knowingly within the meaning of 18 U.S.C. § 875(c). *See, e.g.*, *Elonis*, 841 F.3d at 601 (defendant acted with the intent to threaten when he posted "another violent message" after complaints of co-workers and interview by FBI); *United States v. Baker*, 514 F. Supp. 3d 1369, 1378 (N.D. Fla. 2021) ("[T]he fact that Defendant conveyed similar messages on two separate occasions is sufficient evidence that he acted 'knowingly' and not because of a mistake on his part."). Harding also knew that the Jewish community in Pittsburgh—and more specifically, the neighborhood of Squirrel Hill—had recently endured the mass-murder at the Tree of Life Synagogue. In fact, he celebrated that event. In his own words, Harding said over Instagram that his "favorite cases" included that of Robert Bowers, as well as "columbine, the Oklahoma City bombing, pekka the Finnish school shooter, [and] Brendon tarrant." *See* Exhibit A ¶ 28.

Harding knew his conduct was threatening, and any reasonable person would interpret it as such. Indeed, several reasonable people did interpret it that way. Pursuant to 18 U.S.C. § 2702(b)(8), an internet service provider is permitted to disclose the contents of a subscriber's account to the government if it "in good faith, believes that an emergency involving danger of death or serious physical injury to any person requires disclosure without delay of communications relating to the emergency." Without being requested to do so, Meta made such a voluntary disclosure about Harding to the FBI. *See* Exhibit A ¶¶ 17, 33. Magistrate Judge Kelly recognized the threatening nature of Harding's conduct and communications when she signed the

search warrant for his residence. Magistrate Judge Brown did the same when ordering that Harding remain detained pending trial to ensure the safety of the community.

Those findings are consistent with the inherently threatening nature of communications about firearms and shooting other people. *See, e.g.*, *Elonis*, 841 F.3d at 600 (discussing the threatening nature of talk about a "school shooting"); *Baker*, 514 F. Supp. 3d at 1379 ("Firearms loaded with ammunition are inherently dangerous."). They are also consistent with the fact that Harding's communications represent a "serious expression of [his] intent" to commit violence. *See Elonis*, 841 F.3d at 597. It is significant that Harding possessed more than twenty firearms, which he practiced shooting and could use to act upon his threats. *See* Exhibit A ¶¶ 32, 35–37; *see also United States v. C.S.*, 968 F.3d 237, 245 (3d Cir. 2020) (threats were "serious" where defendant "possessed an extensive collection of weaponry, and he posted photos displaying them . . . to other chatroom participants"). But it is even more significant that Harding discussed owning a Daniel Defense rifle, the specific gun that he had designated for his "high kill count attack" in 2019, and claimed to have equipped it with a forced reset trigger that would allow for more rapid firing. *See* Exhibit A ¶ 33–34. Harding's conduct, as described in the Affidavit, also clearly conveys how "serious" he was about his interest in violence. He belonged to a racially motivated violent extremist group, *see id.* ¶ 27; he was willing to be arrested while acting in furtherance of his ideology, *see id.* ¶ 25; and he visited Columbine High School, *see id.* ¶ 31. All of that information further supports the probable cause finding by Magistrate Judge Kelly.

Ultimately, there was more than a substantial basis for the Court's probable cause finding. There was a "fair probability" to conclude that Harding's electronic devices, likely located in his home, contained threatening communications involving the Jewish community that he professed to have targeted with fliers and swastika flags. There was a "fair probability" to conclude that

those same devices would contain evidence concerning his intent to be the "next shooter," or materials that would place that phrase into context as required by Supreme Court precedent. *See, e.g.*, *Elonis*, 841 F.3d at 597 (citing *Virginia v. Black*, 538 U.S. 343, 360 (2003)). There was a "fair probability" to conclude that his residence would contain firearms, which the Third Circuit has treated as relevant evidence in a threats investigation. *See, e.g.*, *C.S.*, 968 F.3d at 245. And given the reemergence of references to the Columbine shooters and other mass-murders on his social media accounts, there was a "fair probability" that Harding, already adjudicated once for Terrorist Threats, was making threats again. The search warrant affidavit provided Magistrate Judge Kelly with a substantial basis to reach any or all of those conclusions. Under the applicable legal standard, her conclusion is entitled to "a great deal of deference" from this Court, which must avoid any "temptation to second-guess" it. *Ritter*, 416 F.3d at 264. Accordingly, Harding's motion to suppress must be denied.

**B.      None of Harding's Arguments Undermine Judge Kelly's Probable Cause Finding or Justify a *Franks* Hearing**

In his motion to suppress, Harding makes several criticisms of the search warrant affidavit. Most sweepingly, he claims that the warrant lacks probable cause because none of the cited statements itself amounts to a "threat." *See* Def.'s Mot. to Suppress at 1. Even assuming that is true, it does not mean that the warrant lacks probable cause. "Probable cause does not require the same type of specific evidence of each element of the offense as would be needed to support a conviction." *Adams v. Williams*, 407 U.S. 143, 149 (1972). Harding's argument thus "goes much too far in confusing and disregarding the difference between what is required to prove guilt in a criminal case and what is required to show probable cause for . . . search." *Draper v. United States*, 358 U.S. 307, 311–12 (1959) (quoting *Brinegar v. United States*, 338 U.S. 160, 172 – 73 (1949)). "There is a large difference between the two things to be proved [guilt and probable

cause], as well as between the tribunals which determine them, and therefore a like difference in the *quanta* and modes of proof required to establish them." *Id.* at 312 (internal quotation marks omitted). In other words, the government does not need to allege a fully completed crime in order to obtain a search warrant. Instead, a warrant may issue in any case where there is a "fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238. That standard is plainly satisfied here. *See also United States v. Jordan,* 2017 WL 9516819, at *13 (W.D.N.Y. July 14, 2017), *report and recommendation adopted,* 2017 WL 4784317 (W.D.N.Y. Oct. 24, 2017) ("Whether there is enough evidence to ultimately convict [defendant] of making an interstate threat within the meaning of 18 U.S.C.§ 875(c) is not the standard for the issuance of the search warrant. The issue was whether there was probable cause to believe that [defendant's] Facebook account contained evidence of interstate threats.").

More specifically, Harding faults the government for failing to adequately corroborate the Affidavit's allegations that Harding had described himself as a "next shooter" on Threema. *See* Def.'s Mot. to Suppress at 9–10. The individual who reported that statement indicated that the speaker, who was wearing a mask, also identified himself as a member of the Patriot Front who potentially possessed firearms. *See* Exhibit A ¶ 42. That same individual identified the speaker as someone known to them as someone named "Aidan" at a specific phone number. *Id*. Contrary to Harding's contention, all of that information is corroborated by other allegations in the Affidavit. Harding himself indicated that he was a member of the Patriot Front and owned guns. *See, e.g.*, *id.* at ¶¶ 27, 37. Harding has also been quite clear about his admiration for mass-shooters, including his "favorite cases" involving "columbine, . . . pekka the Finnish school shooter, Brendon tarrant, [and] Robert Bowers." *Id.* at ¶ 28. Finally, the Affidavit provides corroboration—through Meta records and law enforcement reports—for the reporting individual's

association of a particular phone number to Harding. *See id.* at ¶¶ 49–51. In short, Magistrate Judge Kelly had a firm basis to consider the allegations about Harding's comments on Threema in the context of her probable cause determination.

Harding also makes several complaints about the Affidavit's discussion of his communications about, and actions toward, Pittsburgh's Jewish community. Harding faults the government for failing to allege that he had "previously threatened to shoot a Jewish person, to open fire in a Jewish community, or attack a Synagogue or a Jewish community center," *see* Def.'s Mot. to Suppress at 8; that he had traveled "to predominantly Jewish locales and flown swastika flags, as well as post or distribute antisemitic [fliers]," *see id.*; or that he had posted threats on Jewish dating sites or Instagram groups, *see id.* at 9. In all of these arguments, Harding is again improperly demanding that the search warrant affidavit prove his guilt beyond a reasonable doubt. *See Draper*, 358 U.S. at 311–12. The search warrant issued because there was a "fair probability" that Harding—a member of the Patriot Front and admirer of Robert Bowers who had been arrested for his "activism," flown Nazi propaganda from bridges, and previously been adjudicated delinquent for using facilities of interstate commerce to make Terroristic Threats about a mass-shooting—would possess evidence of such conduct in his home. More than that, however, Harding is attempting to enforce a standard of directness and specificity that does not apply *even to charged threats*. According to the Third Circuit, threats under 18 U.S.C. § 875(c) "need not be transmitted to the threatened individual." *C.S.*, 968 F.3d at 244 n.5. "There is [also] no rule that conditional statements, statements 'conveying a vague timeline or condition,' or even wishes can never be a true threat." *Id.* at 245 (quoting *Elonis v. United States*, 730 F.3d 321, 334 (3d Cir. 3013) (reversed on other grounds)) (alterations omitted). Harding's arguments would not be

dispositive even at trial or on a motion to dismiss. They certainly do not undermine Magistrate Judge Kelly's finding of probable cause.

Finally, Harding objects to the Affidavit's use of his juvenile adjudication for Terroristic Threats. Specifically, Harding argues that the Affidavit: cannot properly make use of a journal prepared while Harding was a minor and being treated by a therapist, *see* Def.'s Mot. to Suppress at 5; failed to mention that, at the time Harding was adjudicated delinquent for Terroristic Threats he disclaimed any intention to commit a school shooting and lacked the weapons to do so, *see id.* at 6–7; and failed to emphasize that Harding had used the past tense while describing his plan for a high kill count attack, *see id.* at 6–7.

These arguments also miss the mark. Even assuming for the sake of argument that Harding's journal would be inadmissible at trial, it does not follow that it cannot be used in a search warrant affidavit. *Cf. Brinegar*, 338 U.S. at 172 (noting a "wholly unwarranted emphasis upon the criterion of admissibility in evidence, to prove the accused's guilt, of the facts relied upon to show probable cause."). Harding's remaining arguments once again run afoul of the Third Circuit caselaw concerning 18 U.S.C. § 875(c). Every defendant claims that they did not intend to act on their threats, but that is not sufficient to avoid liability. *See, e.g.*, *C.S.*, 968 F.3d at 246 ("C.S.'s argument that he lacked intent because he was pretending to be a warrior for respect or acceptance is irrelevant to the subjective inquiry."). The fact that Harding did not own guns in 2019 would not vitiate probable cause *even in that prior case*, because a statement about using guns can constitute a threat, "even though there was no evidence that the defendant[] owned . . . guns or knew how to use them." *Id.* at 245 n.8. It does nothing at all to undermine the probable cause established in 2024, when Harding *did* own guns. And, finally, Harding's emphasis on his use of past tense in his 2019 communications is misplaced. It is true that Harding said he "had" a plan

11

for a high kill count attack, and that the term "threat" in § 875(c) "refers to the expression of an intent to inflict injury in the present or future." *See United States v. Stock*, 728 F.3d 287, 297 (3d Cir. 2013). Yet Harding's messages also express an intent to "do it when I'm like 19 or 21" and "leave my mark on the world." *See* Exhibit A ¶ 44. Even "an expression of an intent to injure in the past may be circumstantial evidence of an intent to injure in the present or future." *Stock*, 728 F.3d at 300. But Harding's statements are explicitly forward looking—to the precise period of the search warrant in this case.

Magistrate Judge Kelly had a substantial basis to conclude that warrant was supported by probable cause. Harding's arguments to the contrary do not undermine that conclusion. Although Harding cites *Franks v. Delaware*, 438 U.S. 154 (1978), his "complaint [with the warrant] is limited to the absence of probable cause to search his home." *See* Def.'s Mot. to Suppress at 2. He does not request a *Franks* hearing. That is appropriate, because he has not identified any material misstatements or omissions that would affect Magistrate Judge Kelly's probable cause determination. For all of those reasons, Harding's motion to suppress must be denied.

**C.      All Evidence Obtained Through the Search is Admissible Because the Good-Faith Exception Applies**

Even if the Court concluded that Magistrate Judge Kelly lacked a substantial basis for her probable cause finding, suppression of evidence would be inappropriate under the good-faith exception. The exclusionary rule applies only "in those 'unusual cases' where it may achieve its 'remedial objectives': to appreciably deter unreasonable searches and seizures by law enforcement officers." *United States v. Caesar*, 2 F.4th 160, 169 (3d Cir. 2021). "[I]n determining whether the exclusionary rule applies, [the Third Circuit] engage[s] in a cost-benefit analysis, balancing the deterrence benefits of suppression against its substantial social costs." *United States v. Werdene*,

883 F.3d 204, 215 (3d Cir. 2018) (internal quotation marks omitted). Because of those costs, "suppression of evidence . . . has always been [courts'] last resort, not [their] first impulse." *Id.* at 215 (citing *Hudson v. Michigan*, 547 U.S. 586, 591 (2006)).

The good-faith exception to the exclusionary rule, announced in *United States v. Leon*, 468 U.S. 897 (1984), "effectuates this balance by forbidding suppression where officers act in 'good faith' or 'objectively reasonable reliance' on a search warrant later held to be defective." *Caesar*, 2 F.4th at 169. Because "police officers are not trained attorneys and generally cannot be expected to second-guess a magistrate's probable cause determination," the "mere existence of a warrant typically suffices to prove that an officer conducted a search in good faith." *Id.* at 170 (internal quotation marks omitted). There "only four scenarios in which reliance on a warrant is unreasonable." *Werdene*, 883 F.3d at 217. They are where:

> (1) the magistrate issued the warrant in reliance on a deliberately or recklessly false affidavit; (2) the magistrate abandoned [her] judicial role and failed to perform [her] neutral and detached function; (3) the warrant was based on an affidavit so lacking indicia of probable cause as to render official belief in its existence entirely unreasonable; or (4) the warrant was so facially deficient that it failed to particularize the place to be searched or the things to be seized.

*Id.*

Harding has not established that any of those scenarios exist here. To the contrary, the agents in this case acted with abundant good faith, preparing and executing a detailed and legally sufficient warrant in an attempt to disrupt Harding's conduct and thereby protect the community. There is no "deliberate, reckless, or grossly negligent" government misconduct to deter, and the costs of suppression involve serious risk to the public. *See id.* at 216. Thus, the required cost-benefit analysis weighs heavily against suppression, the good-faith exception applies, and Harding's motion to suppress must be denied.

**II.    Harding's Motion for Discovery Should also Be Denied**

Harding's motion for discovery seeks additional access to the contents of his seized electronic devices.   *See* Def.'s Mot. for Discovery.   The government is willing to work with his attorneys on most aspects of this request.   There are some items, like child sexual abuse material, that the government cannot produce to Harding or his counsel.   It is also unduly burdensome for the government to redact all such items from Harding's devices and produce to him the remaining electronic data.   But the government can arrange time for Harding's attorneys and retained experts to review the contents of the devices at the Federal Bureau of Investigation, outside the presence of agents or prosecutors.   The defense team would also be permitted to bring a thumb drive, which can be loaded with materials of the defense team's selection and removed from the building—so long agents can first confirm that the drive does not contain any contraband.   Accordingly, the government requests that the motion be denied as moot, subject to further discussions by the parties.

Respectfully submitted,

TROY RIVETTI
Acting United States Attorney

By:   */s/ Jeffrey R. Bengel*
JEFFREY R. BENGEL
Assistant United States Attorney
DC ID No. 1018621